any foundation to demonstrate that the statements are made upon personal knowledge. Accordingly, it does not meet the legal requirements necessary to support a motion for summary judgment. Fed. R. Civ. P. 56(f); Lopez-Carrasquillo v. Rubianes, 230 F.3d 409, 414 (1st Cir. 2000) (affidavit submitted in connection with summary judgment motion made "to the best of my knowledge" was insufficient).[5] Because this declaration is the sole evidentiary basis for Defendants' purported statement of undisputed facts, they have failed to provide any competent evidence to support their motion and cannot satisfy their burden to establish that there is no genuine issue of material fact that Defendants have met the statutory mandate at issue. For this reason alone, the motion for summary judgment should be denied.

## C.    STATEMENT OF FACTS.

For purposes of summary judgment, the facts are as follows:[6]

---

[5]    The Cox Declaration is also flawed in that it contains internal contradictions, conclusory statements rather than statements of fact, and opinions that Mr. Cox is not competent to provide. For instance, Mr. Cox asserts that "Medical and dental services and benefits have not been eliminated or reduced." (Cox Declaration, ¶ 6). Yet, later in the same paragraph, Mr. Cox contradicts himself by admitting that the Home previously had a physician in the primary treatment room 24 hours a day, but the physician has now been replaced by a nurse from 4:00 p.m. to 7:30 a.m. Mr. Cox also admits that x-ray services were discontinued at the Home in 2003 and only partially reinstated in May, 2005 (after Plaintiffs had met with representatives at the Department of Defense). Finally, Mr. Cox offers the opinion that "AFRH continues to provide residents high quality care." (Cox Declaration, ¶ 8). Not only is this a statement of opinion, not fact, but Mr. Cox provides no foundation to suggest that he is competent to offer opinion testimony as to the quality of health care provided. The statements of opinion in the Cox Declaration should be stricken for this reason as well. See Judicial Watch, 224 F.R.D. at 264 (striking "unsubstantiated opinion for which [declarant] lacks the first-hand knowledge and personal experience necessary to render her competent").

[6]    As is discussed above, Defendants have failed to satisfy their initial burden on a motion for summary judgment. If, however, the Court elects to consider the alleged facts submitted by Defendants, such matters of fact are, at a minimum, subject to dispute. This Memorandum is accompanied by a Statement of Facts as to Which There is a Genuine Dispute, along with supporting Declarations, which clearly demonstrate that there are genuine issues of material fact that preclude judgment as a matter of law.

1.     The Home is a continuing care retirement community with approximately 1,000 residents.    The Home consists of an Independent Living facility with approximately 800 residents and a Long Term Care facility with about 200 residents.  (Cox Decl., ¶ 6(e)) (FY 2004 Annual Performance and Accountability Report, hereinafter, "2004 Annual Report," p. 35).   In addition, approximately 400 new residents from the Armed Forces Retirement Home-Gulfport (Mississippi) moved to the Home, after the Gulfport facility was damaged by Hurricane Katrina.

2.     The Home's operations are funded by a trust fund which receives its revenues from money collected from monthly active duty payroll deductions from enlisted military personnel (currently 50 cents per month), resident fees, fines and forfeitures from the armed forces, interest on the trust fund, and other sources.  In 1995, Congress authorized an increase in the monthly active duty payroll deduction to $1 per month.   Despite this authorization, Defendants have never implemented the increase.  If the increase were implemented, it would generate an additional $7 million per year for the Home.  (Chief Operating Officer Fact Sheet No. 1, hereinafter "Fact Sheet No. 1," ¶ 1) (Defendants' Statement of Fact, ¶ 4).

3.     In 2002, Timothy C. Cox became the Chief Operating Officer at the Home.  In 2003, Mr. Cox launched a series of "major initiatives" at the Home.  The first strategic goal of these initiatives was to "create financial net growth and stability for the trust fund."  (Cox Decl. ¶ 2); (2004 Annual Report, p. 9).

4.     The initiatives at the Home included a "comprehensive health and wellness strategic initiative," the focus of which was "to make contracted physicians the primary providers of care, and thereby increase revenue."  (2004 Annual Report, p. 37).

5.     In the process of implementing the changes to the health care system in place at the Home, Defendants reduced both the availability of medical care and the quality of medical

care for the residents.   Among other things, the primary treatment room was closed, x-ray services were eliminated, the pharmacy was outsourced, and the availability of a physician 24 hours a day has been eliminated.  (Rutherford Decl. ¶ 3; Murray Decl. ¶ 6; Tsukano Decl. ¶¶ 4-13); (See ¶¶ 8-14, below).

6.     In February, 2005, a representative of the Plaintiffs met with representatives of the Department of Defense to raise specific concerns about the reductions in available medical care at the Home.  On March 11, 2005, the Department of Defense provided a written response in which it made no commitment to make any changes in response to the residents' concerns.  (Rutherford Decl. ¶ 3).

7.     On May 24, 2005, Plaintiffs filed the present action.  Since that time, Defendants have issued a number of "fact sheets" in which they claim to have restored certain medical services – such as x-rays, availability of medications, and transportations services – that had been reduced or eliminated.  (Fact Sheet No. 8; Fact Sheet No. 10).  In reality, these allegedly restored services are either inadequate or have been denied to residents.  (See ¶¶ 12-14, 16, below).

**Treatment Room Closed**

8.     Until November, 2003, the Home maintained a treatment room that was open for Independent Living residents 24 hours a day, 7 days a week, and staffed at all times by a physician and emergency medical personnel.  If a resident had an emergency medical condition, such as a fall in the night, this medical staff was available to come to the resident's room 24 hours a day.   The Home also had two ambulances that it used to transport residents, when needed, to other facilities.  (Cox Decl. ¶ 6(c)); (Murray Decl. ¶ 5).

9.     On November 10, 2003, the primary treatment room was closed.  Presently, a physician is only available and on site between 7:30 a.m. and 4:00 p.m.  If a resident requires

medical assistance in the middle of the night, the procedure is for the resident to call the security supervisor (not a licensed health care provider) who will call the nurse on duty. Together, the security supervisor and duty nurse make a determination as to whether to call 911. If they call 911, an ambulance comes to take the resident to the emergency room at some other facility. The Home does not pay for the emergency transportation and residents have incurred hundreds of dollars in expenses for such transportation. While Defendants contend that a physician is "on call ... for consultation" after hours and on the weekends, the physician on call is not on site at the Home. Residents who have asked to see a physician on weekends have been informed that there is no physician available and that they will need to wait until Monday. (AFRH Bulletin, November 14, 2003); (Rutherford Decl. ¶ 9); (Murray Decl. ¶ 4); (Cox Decl. ¶ 6(c)).

**Pharmacy Eliminated**

10.     Previously, the Home operated a 24 hour-a-day, on-site pharmacy at which residents could obtain prescription medications the same day that they were prescribed. In 2003, the Home closed the pharmacy and replaced it with an outside source. With the new provider, most prescriptions are filled at Walter Reed Army Medical Center. Unless the resident goes in person to pick up the prescription, it typically takes three days to receive them. When a prescription cannot be filled at Walter Reed, residents obtain the prescriptions at local pharmacies. The Home does not provide transportation to the local pharmacies. (Rutherford Decl. ¶¶ 4, 5) (2004 Annual Report, p. 37).

11.     Because the Home does not actually deliver prescriptions to residents on the day they are prescribed, in 2004 a group of residents who own cars formed a volunteer carpool system to pick up prescriptions for residents who require their medication immediately. When residents require emergency medications, a nurse from the community health center at the Home

calls one of the members of the carpool group. The driver will them pick up the patient (or the patient's identification card) and drive to Walter Reed (in his personal car and at his personal expense) to obtain the medication for the resident. The nurses typically call once or twice a week for this voluntary service, and have continued to call for this service throughout the summer of 2005. (Rutherford Decl. ¶¶ 6, 7).

12.     After this lawsuit was filed, Defendants have made various claims about the level of service provided. On May 31, 2005, Mr. Cox issued a "fact sheet" stating that "independent residents can receive their medication the same day." Notwithstanding this claim, in practice, the Home does not provide residents with new prescriptions on the same day.  (Rutherford Decl. ¶¶ 4-6); (Murray Decl. ¶ 4).

13.     The administration at the Home has long been aware that the prescription services at the Home were inadequate. In July, 2004, a physician at the Home reported in a morning meeting that "there is no provision to issue medications to outpatients on the weekend." This situation has not been corrected. On July 11, 2005 – a year later, and after this action was filed -- the Home further announced that "effective immediately, AFRH residents will now have medications available to them after hours" and that the medications will be available when the clinics are closed. This announcement vastly overstates the services actually provided. In fact, the Home only maintains a few over-the-counter medications for such purposes. Indeed, medical staff at the Home informed residents that the only medicine available at the Home is "stuff for headaches." (Morning Meeting Minutes, July 8, 2004); (Murray Decl. ¶ 4); (Rutherford Decl. ¶ 8); (Fact Sheet No. 10).

**X-Ray Services**

14.    In 2003, the Home eliminated the provision of x-ray services on-site for the residents.  Defendants admit that the Home did not provide any x-ray services at the Home for two years.  On May 31, 2005 – a week after Plaintiffs filed this lawsuit – Mr. Cox published a "fact sheet" which stated that "since May 1, 2005, x-ray services are provided by a vendor who comes to the resident's bedside or room."  Once again, the "fact sheet" does not describe the medical care actually available at the Home.  In practice, the Home still refuses to provide x-ray services to residents and instructs them to go to Walter Reed to get x-rays.[7]  (Fact Sheet No. 8); (Cox Decl. ¶ 6(f)); (Hill Decl. ¶ 4).

**Transportation Services**

15.    Previously, the Home had an ambulance service for residents.  This service has been discontinued.  Now, the only medical-related transportation that the Home provides is a shuttle service to Walter Reed, the VA Hospital, and Washington Hospital Center, with limited hours.  In many cases, the limited transportation provided is not an option for residents who are feeble, ill, or confused.  (Rutherford Decl. ¶¶ 4, 5); (Murray Decl. ¶ 5).

16.    On July 11, 2005 – approximately seven weeks after this action was filed – Mr. Cox announced that "[e]ffective immediately, after hours non-emergency transportation will be available" including "weekends and holidays."  Since that time, however, the Home continues to inform residents that transportation is not available.  On Sunday, August 14, 2005, a resident who believed he was suffering from a recurrence of a chronic condition requested transportation

---

[7]    In addition to being in violation of the AFRHA, the constant referrals to Walter Reed for services that should be provided at the Home are an inconvenience to the residents.  With the pending closure of Walter Reed and relocation of its facilities many miles away, continued reliance upon services at Walter Reed would cause even greater hardship on the residents of the Home.

to Walter Reed for treatment. The nurse informed him that no transportation was available and that he would have to arrange for his own transportation or wait for the bus on Monday. (Murray Decl. ¶ 4); (Fact Sheet No. 10).

**Dental Services**

17.    Defendants assert that the dental clinic was recently located "to provide enhanced and more accessible dental services." In fact, dental services at the Home have also been reduced. Previously, the Home provided services such as tooth extractions for residents. This service is no longer provided. Residents are required to go to private dentists to obtain such services, and pay out-of-pocket for them. Earlier this year, a resident was denied dental services at the Home and incurred thousands of dollars of out-of-pocket expenses for primary care-type services at a private dentist. (Cox Decl. ¶ 6(a)); (Renzi Decl. ¶ 4).

**Quality of Care**

18.    In addition to these specific instances of reduction in the availability of services at the Home, their cumulative effect has been to compromise the overall quality of medical care and availability of medical services at the Home. More and more services at the Home are being contracted out instead of handled by regular employees. Due to cutbacks, fewer people have had to handle more tasks. Physicians at Walter Reed, who have treated residents for various specialized conditions, have commented about how their overall condition indicated that they were not receiving adequate care. Medical staff at the Home have resigned due to the changes at the Home. Long term residents, as well as non-resident spouses who visit on a regular basis, have recognized a decline in the number of staff, the services provided, and the quality of care. (Tsukano Decl. ¶¶ 4, 11); (Murray Decl. ¶ 6) (Fisher Decl. ¶ 7).

**D.    DEFENDANTS' HAVE FAILED TO MEET THEIR BURDEN TO ESTABLISH THAT THEIR CONDUCT SATISFIES THE STATUTORY REQUIREMENTS OF THE AFRHA.**

Pursuant to 5 U.S.C. § 706(2)(A), agency action shall be held unlawful and set aside if it is found to be: (i) arbitrary; (ii) capricious; (iii) an abuse of discretion; or (iv) otherwise not in accordance with law.  In moving for summary judgment, Defendants bear the burden to establish that, when all factual inferences are drawn in Plaintiffs' favor, Defendants' actions were not arbitrary, were not capricious, did not constitute an abuse of discretion, and were in accordance with law.

In their motion, Defendants focus their discussion on the issue of whether the agency's actions were arbitrary and capricious.  Relying upon the Cox Declaration, Defendants argue that their decisions regarding health care at the Home were not arbitrary and capricious because they had a rational basis for all changes that were implemented.  As such, Defendants contend, they are entitled to judgment as a matter of law.  Defendants' arguments fall far short, however, of establishing that there is no genuine issue as to the material facts and that they are entitled to summary judgment as a matter of law in regard to the mandatory requirements of  24 U.S.C. § 413.

**1.    Defendants' Conduct Is Based Upon A Flawed Interpretation Of An Unambiguous Statute.**

Defendants contend that in construing statutes, the Court should not substitute its judgment for that of the agency and the agency's administrative decisions should be given deference. (Def. Mot., p. 3).  However, when it comes to questions of the interpretation of a statute, "[t]he plain meaning of a statute controls, if there is one, regardless of an agency's interpretation." In Home Health, Inc. v. Shalala, 188 F.3d 1043, 1046 (8th Cir. 1999), citing Chevron, 467 U.S. 837, 842-43 (1984).    Agency action that is based on an erroneous

interpretation or misapplication of the relevant statutory provisions is not in accordance with law. See Williams v. Washington Metropolitan Area Transit Comm'n, 415 F.2d 922, 939 n.86 (D.C. Cir. 1968) (agency action must be set aside as unlawful when the absence of findings reflects arbitrariness or misapplication of statutory standards).

Defendants allege that the elimination of medical services at the Home was necessary in order to meet the "competing interests involved in maintaining the high quality of health care, while also meeting the Congressional intent of doing so in a cost effective manner." (Motion, p. 11). Mr. Cox acknowledges that his "main focus was to increase the value of the Trust Fund through increased revenues and decreased costs." (Cox Declaration, ¶ 6). These statements reveal that Defendants' conduct was based on an erroneous interpretation of the applicable statute. The statute contains the unequivocal mandate that Defendants provide on-site, high-quality health care. While the statute also provides that Defendants shall do so in a cost-effective manner, it does not permit Defendants to elevate their cost-cutting concerns above the requirement to provide high-quality, on-site medical care. Thus, the efforts to "streamline the operation of the Home" by such measures as limiting the availability of a physician, closing the pharmacy, eliminating dental services, and other such reductions in availability were based upon a flawed interpretation of relevant statutory provisions and were "not in accordance with law." See also Sarasota Memorial Hospital v. Shalala, 60 F.3d 1507, 1511 (11th Cir. 1995) (courts are not bound by an agency's interpretation of a statute and should review an agency's statutory construction that is alleged to be inconsistent with the statutory mandate); Mt. Emmons Mining Company v. Babbitt, 117 F.3d 1167, 1170 (10th Cir. 1997) (a reviewing court need not accept agency interpretations which frustrate the policy that Congress sought to implement).

2.    **Defendants Have Failed To Establish That Their Actions Are "In Accordance With Law."**

Defendants have failed to establish that they are entitled to judgment as a matter of law on the issue of whether their conduct in providing medical care at the Home is "in accordance with law" within the meaning of Section 706(2)(A) of the APA.

The APA provides that a court "shall hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action that fails to satisfy the requirements of a statute or regulation "cannot be considered to be in accord with law" and must be set aside. See In Robert E. Derecktor of Rhode Island, Inc. v. Goldschmidt, 506 F. Supp. 1059, 1063 (D.R.I. 1980) (declaring unlawful the award of a contract in violation of mandatory requirements of governing regulations).

When an agency does not comply with the provisions of a statute or regulation, courts have readily declared the agency action to be unlawful under Section 706(2)(A) of the APA. See Ethyl Corporation v. EPA, 306 F.3d 1144 (D.C. Cir. 2002) (agency action was "not in accordance with law" when the agency issued regulation that did not satisfy mandatory requirements contained in statute); In Home Health, Inc. v. Shalala, 188 F.3d 1043 (8th Cir. 1999) (setting aside decision of secretary to limit reimbursement to provider of physical therapy services as not in accordance with law when secretary's decision did not comply with statute); ACEMLA v. Copyright Royalty Tribunal, 763 F.2d 101 (2d Cir. 1985) (failure of Copyright Royalty Tribunal to comply with statutory command to require that claimants prove entitlement to royalties prior to distribution was "not in accordance with law"); Citizens for a Better Environment v. EPA, 596 F.2d 720 (7th Cir. 1979) (agency action that does not satisfy statutory duty must be overturned);

In the present case, Defendants have failed to establish that, when all factual inferences are drawn in Plaintiffs' favor, their conduct with respect to health care at the Home is in accordance with law.  Defendants have not presented competent evidence that establishes that they provide high quality, on-site primary medical care to the residents at the Home.  When viewed in the light most favorable to Plaintiffs, the evidence for purposes of this motion includes the following: (1) Defendants closed the primary treatment room at the Home and only provide limited access to physicians; (2) Defendants changed the policy that provided access to a physician 24 hours a day, leaving no physicians on site to provide medical care between the hours of 4:00 p.m. and 7:30 a.m. or on weekends or holidays; (3) Defendants closed the pharmacy and contracted with an outside pharmacy and, as a result, residents now must wait three days to obtain new prescriptions from an off-site location; (4) Defendants eliminated x-ray services at the Home and residents are referred to an off-site facility to obtain x-rays; (5) Defendants eliminated emergency and after-hours transportation to other medical facilities; and (6) Defendants eliminated the on-site availability of routine dental services such as tooth extractions.  These specific actions, individually and cumulatively, are substantial evidence that Defendants are not satisfying their mandatory statutory duty to provide high quality, on-site primary medical and dental care.

Even ignoring the legal insufficiency of Defendants' proffered evidence, Defendants have failed to support any finding that the limited medical services provided are in accordance with the statutory requirements that they are provided "on-site" and in a high quality manner.

### (a)     Many Of The Services Available Are Not "On-Site."

Defendants do not even contend that residents receive high-quality, **on-site** medical care. Defendants argue only that "the attached declaration from the Director of the Home, Mr.

Timothy Cox, establishes conclusively that the Home provides high quality health services to its residents." (Motion, pp. 10-11); see also Cox Declaration, ¶ 8 (contending that "AFRH continues to provide residents high quality care" without asserting that the care is provided on-site).

The evidence confirms that, with the elimination of health care services at the Home, residents are increasingly being sent off-site for primary medical care. For instance, residents that need to actually see a physician other than during the hours of 7:30 a.m. to 4:00 p.m. have no choice but to go to an off-site facility, because there is no physician available at the Home during those hours. Residents that require x-rays are referred to Walter Reed. Residents that need new prescriptions on the same day do not receive them at the Home. They must rely upon a voluntary car pool **provided by other residents** to obtain their medications at an off-site facility.

Taken together, Defendants failure even to claim to provide high-quality, on-site medical care, and the evidence demonstrating that the basic services are not available on-site, support a determination that the health care is not provided on-site and therefore Defendants' conduct is "not in accordance with law."

> **(b)      Defendants Offer No Basis To Find That The Health Care Provided Is "High Quality."**

Defendants have likewise failed to offer any basis to find that the health care provided at the Home is high-quality. Congress and the courts have recognized that the quality of health care can be measured by various means, including the development and maintenance of a plan of health standards and an ongoing review of whether the standards in the plan are being met.[8] See

---

[8]      Whether a health care plan provides for "high quality" care is a determination that can be made by the fact finder. This standard can be measured like others that depend on the evidence presented, such

*(footnote continued to next page)*

Estate of Smith v. Heckler, 747 F.2d 583, 589-90 (10th Cir. 1984) (addressing methods for assuring that facilities receiving federal Medicaid funds are satisfying statutory requirement to provide high quality patient care).[9]

When the evidence in the record is viewed in the light most favorable to the Plaintiff, there is at least a genuine issue of material fact as to whether Defendants are providing high-quality, on-site medical care. Accordingly, summary judgment is not warranted.

### 3.     Defendants Have Failed To Establish That Their Conduct Has Not Been Arbitrary And Capricious.

Defendants also have failed to meet their burden of showing that there is no genuine issue of material fact as to whether their conduct was not arbitrary and capricious. Defendants urge the Court to find that they have satisfied this burden because their conduct had a rational basis. This argument is likewise without merit.

To survive review under the arbitrary and capricious standard, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983), quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962). In reviewing that explanation, the court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Motor Vehicle Mfrs. Ass'n, 462 U.S. at 43 (citation omitted). Normally, an agency rule would be arbitrary and capricious if the agency

---

*(footnote continued from previous page)*
as a "reasonable care" standard in a tort case. Plaintiffs anticipate offering expert testimony at the appropriate time on whether the standard has been met.

[9]     Mr. Cox is not an expert on health care quality and his Declaration does not provide any foundation to determine that he is. His statements on the issue of quality should be stricken.

has relied upon factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.  Id.

Defendants' own statements reveal that they are not basing their decisions on the relevant statutory criteria.  As acknowledged by Mr. Cox, in making changes to the health care services at the Home, his primary objective has been to reduce costs, not to provide high quality, on-site medical care:

> [T]he major goal of the AFRH, as I took the job, was to become financially self-sustaining while maintaining or improving the high-quality care we provide to residents.  **My main focus was to increase the value of the Trust Fund through increased revenues and decreased costs.**

Cox Declaration, ¶ 6 (emphasis added).[10]  Defendants' actions reflect this emphasis on cutting costs at the expense of providing on-site, high-quality care.  Defendants have eliminated or reduced on-site medical care, including access to physicians, pharmacy services, x-ray services, dental services, and transportation services.  Defendants admit that these changes have impacted the medical care available to residents.  In his Declaration, Mr. Cox acknowledges eliminating the 24-hour access to a physician on-site, but he seeks to justify this action based upon a "major reduction in costs."  (Cox Decl. ¶ 6(c)).  He further acknowledges that the 24-hour pharmacy was closed and contracted to an outside source (resulting in a three day waiting period to obtain new medications), asserting that "operation of the pharmacy was not a cost-effective means of

---

[10]    This same emphasis is detailed in the Home's 2004 Annual Performance and Accountability Report, which describes how "the focus of [the health and wellness strategic initiative] is eventually to make contracted physicians the primary providers of care and thereby increase revenue.  (2004 Annual Performance and Accountability Report, p. 37).

providing Independent Living residents with medications." (Cox Decl. ¶6(e)). Further, the so-called "more cost effective service delivery model" relies in large part on referrals to off-site facilities,[11] contrary to the unambiguous mandate in the statute to provide on-site care. See Natural Resources Defense Council, Inc. v. EPA., 22 F.3d 1125, 1143-4 (D.C. Cir. 1994) (when statutory provisions contain a conjunctive requirement, the failure to comply with one is "out of keeping with clear statutory requirements"); see also Natural Resources Defense Council, Inc. v. Reilly, 976 F.2d 36, 41 (D.C. Cir. 1992) (even where statute contains general rulemaking power, this cannot trump clear statutory requirements).[12] Defendants have chosen a course of a reducing and eliminating of medical services even though there is a readily-available source of funds to replenish the trust fund. In 1995, Congress authorized an increase in the payroll deduction for active-duty enlisted personnel which would generate an additional $7 million in revenue for the trust fund each year. (Chief Operating Officer Fact Sheet No. 1). Nevertheless, Defendants have **elected** to forego this authorized revenue source in favor of cutting medical services for the residents. Because Defendants have acted and failed to act in such a manner that they willfully have disregarded the clear Congressional mandate in the AFRHA to provide on-site high-quality health care at the Home , the Defendants' conduct has been arbitrary and capricious.

The rational basis test, as framed by Defendants, is also not an appropriate measure in this case, given the clear statutory mandate. In regard to the rational basis test, the court must

---

[11]     Indeed, in arguing that the Home continues to provide high quality (but not on-site) medical care, Mr. Cox states that "more extensive dental needs are handled by referrals" (¶ 6(a)), "residents have access to physicians at the Walter Reed Medical Center, the Veterans Administration, and local hospitals" (¶6(b)), and "residents have freedom of choice in choosing physicians in the private sector" (¶6(b)).

[12]     An agency cannot disregard a statutory requirement because, in its discretion, fulfilling the requirement would be too costly. See Forest Guardians v. Babbitt, 174 F.3d 1178 (10th Cir. 1999) (rejecting "inadequate resources" argument raised in defense of failure to perform mandatory statutory duty).

make a substantial inquiry into the facts to ensure that the agency demonstrates a rational connection between the facts found and the choice made. Dickson v. Secretary of Defense, 68 F.3d at 1404-05, citing Motor Vehicle Mfrs. Ass'n, 462 U.S. at 43. As a preliminary point, it must be noted that, in the present case, there have been no such findings, so there is no record upon which to evaluate whether there was a rational basis for the agency action in eliminating medical services. Nor do the conclusory and contradictory statements in the Cox Declaration provide a sufficient basis to conclude that Defendants' conduct reflects a rational decision between facts found and choices made. Even more fundamentally, however, Defendants' argument is plainly flawed insofar as they contend that the decisions regarding the provision of health care at the Home are completely within the chief operating officer's discretion, regardless of the statutory mandate. Taken to its logical conclusion, under this analysis, the chief operating officer could decide that the Home would not provide **any** medical services to its residents, but that, instead, the residents could go to the Veterans' Administration Hospital, Walter Reed, or another provider for all of their medical needs. In light of the claimed diminishing trust fund, this hypothetical decision might be characterized by the Defendants as "rational." The obvious problem, however, is that this "rational" approach would be in clear violation of the statutory mandate to provide high-quality, on-site health care. In short, given the plain language of the AFRHA, the "rationality" of Defendants' conduct provides no defense to the Plaintiffs' claim that such conduct fails to meet the statutory standard.

Finally, Defendants argue that "the choice of one particular action over another is not arbitrary, capricious or an abuse of discretion 'simply because one may happen to think it ill-considered, or to represent the less appealing alternative solution available.'" (Def. Mot. p. 13). This argument misses the point. Plaintiffs do not contend that Defendants have no discretion in

satisfying their statutory mandate. The discretionary component of the agency action, however, is not **whether** to comply with the statute, but **how** to meet the statutory mandate. Plaintiffs are not challenging Defendants' deliberative process or their delivery model as such. Decisions regarding how to provide on-site, high-quality health care -- such as whether to use contract physicians rather than employed physicians, an on-site contract prescription drug service rather than operating a pharmacy, or a contract vendor to provide x-rays rather than employed medical staff to provide x-rays – are within Defendants' discretion **provided** that Defendants provide the high-quality, on-site care mandated by statute. Plaintiffs challenge how Defendants have conducted operations at the Home to the extent that Defendants' action and inaction has resulted in a failure to meet their statutory duty -- to that extent, Defendants have abused their discretion.

For all of these reasons, Defendants are not entitled to summary judgment.

## E.     PLAINTIFFS ARE ENTITLED TO DISCOVERY UNDER RULE 56(f).

As explained above, Plaintiffs submit that Defendants have failed to establish that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. The record at this early stage in the litigation, however, is limited. Defendants have sought summary judgment prior to the onset of discovery. No written discovery has been exchanged and no depositions have been taken. Plaintiffs respectfully request that, if the request for summary judgment is not denied at this juncture, as it should be, Plaintiffs should be afforded an opportunity to conduct discovery as to the material facts in accordance with Rule 56(f).

Rule 56(f) provides:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed. R. Civ. P. 56(f). "The purpose of 56(f) is to provide non-movants with a much needed tool to keep open the doors of discovery in order to adequately combat a summary judgment motion." Wichita Falls Office Assoc. v. Banc One Corp., 978 F.2d 915, 919 (5th Cir.1992). Burlington N. Santa Fe R.R. Co. v. Assiniboine & Soiux Tribes of the Fort Peck Reservation, 323 F.3d 767, 773 (9th Cir. 2003). Where a summary judgment motion is filed so early in the litigation, before a party has had any realistic opportunity to pursue discovery relating to its theory of the case, district courts should grant any Rule 56(f) motion fairly freely. Berkeley v. Home Ins. Co., 68 F.3d 1409, 1414 (D.C. Cir.1995).

In the present case, Plaintiffs have reason to believe that there is a substantial body of evidence that is highly relevant to the quality of health care provided to the residents at AFRH. Plaintiffs have received informal, unsolicited information from medical personnel with actual knowledge of the medical care provided to residents at the Home. Among other things, Plaintiffs have been informed of the following:

- Residents with medical needs are not receiving adequate medical care and are suffering as a result.

- In 2004 a resident lost both legs because of "bad care" by the medical staff at the Home. Another resident, who had pressure ulcers on both heels, had his wounds wrapped with unsterile dressings because the Home had run out of supplies for his ulcer care. The Home has also run out of catheters.

- A resident from Independent Living recently died with severe clinical signs of malnutrition and dehydration. We have been informed that a full investigation has been ordered.

- A resident at the Long Term Care facility in the LaGarde Building at the Home, who cannot feed himself, was admitted to Walter Reed with clinical proof of severe malnutrition and dehydration. He also had a broken arm that had been untreated for months. A social worker recently reported this situation to adult protective services.

- Physicians from Walter Reed who have treated residents from the Home have been so concerned that they have reported specific cases to the Long Term Care ombudsman at the Home.

- Long time medical staff have resigned because of the changes implemented in the medical care for residents.

These reports suggest a substantial body of additional evidence that could be gleaned through discovery that would raise additional genuine issues of material fact as to the quality of health care provided to residents at the Home.

Despite receiving these reports, Plaintiffs have not had the opportunity to conduct any discovery as to these issues. Indeed, when Plaintiffs sought to conduct informal discovery through interviewing a former nurse from the Home to discover facts that are material to this action, the Department of the Army blocked these efforts. See December 10, 2004 Letter from Department of the Army, Office of the Center Judge Advocate. Thus, Plaintiffs have been denied the opportunity to discover facts relevant to this action.

If Plaintiffs are afforded an opportunity to conduct discovery pursuant to Rule 56(f), they would anticipate conducting written discovery regarding, among other things, the specific changes in the level of health care that is available to residents at the Home, the policies regarding health care at the Home, information about what health care is actually provided, and reports and investigations as to the health care provided at the Home. Plaintiffs also will take deposition testimony from, among others, members of management and policy makers at the Home, health care providers at the Home (or formerly at the Home), and other medical personnel who have knowledge of the health care provided at the Home (such as personnel at Walter Reed). See Declaration of David H. Bamberger, attached hereto.

## CONCLUSION

For all of the reasons and upon all of the authorities set forth herein, Plaintiffs respectfully request that Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment, be denied.

Respectfully submitted,

_____/s/_____
David H. Bamberger (D.C. Bar No. 362285)
J. David Folds (D.C. Bar No. 449791)
Dimitra D. Joannou (D.C. Bar No. 488973)
Mila Z. Zain (D.C. Bar No. 490282)
DLA PIPER RUDNICK GRAY CARY U.S. LLP
1200 Nineteenth Street, N.W.
Washington, D.C. 20036-2412
Phone: (202) 861-3900
Fax: (202) 223-2085

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of September, 2005, I caused a copy of (i) Plaintiffs'
Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss or, in
the Alternative, for Summary Judgment and (ii) Request for Hearing; to be mailed, postage
prepaid, to:

>       Kevin K. Robitaille
>       Special Assistant U.S. Attorney
>       555 Fourth Street, N.W.
>       Washington, D.C. 20530

Respectfully submitted,


_____/s/_____
David H. Bamberger (D.C. Bar No. 362285)
J. David Folds (D.C. Bar No. 449791)
Dimitra D. Joannou (D.C. Bar No. 488973)
Mila Z. Zain (D.C. Bar No. 490282)
DLA PIPER RUDNICK GRAY CARY U.S. LLP
1200 Nineteenth Street, N.W.
Washington, D.C. 20036-2412
Phone: (202) 861-3900
Fax: (202) 223-2085

Attorneys for Plaintiffs

~WASH1:4726684.v8

40