# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MARTIN CODY, et al.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **Civil Action No. 05-1041 (RJL)** |
| | ) | |
| **DONALD RUMSFELD,** | ) | |
| **Secretary of Defense, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS
## FOR WHICH THERE EXISTS AN ISSUE TO BE LITIGATED

Plaintiffs, through counsel, pursuant to Rule 56 of the Federal Rules of Civil Procedure, and LCvR 7(h) and LCvR 56.1, hereby respond to Defendants' Statement of Material Facts Which Are Not in Genuine Dispute ("Defendants' Statement of Facts"), and respectfully submit this statement of material facts for which there exists an issue to be litigated.

**Defendants' Allegation of Fact No. 1:**

The Armed Forces Retirement Home (AFRH) consists of the Armed Forces Retirement Home – Washington, located in Washington, D.C., and the Armed Forces Retirement Home – Gulfport,, in Gulfport, Mississippi.  Both homes are continuing care retirement communities, which provide residences and related services for retired and former members of the Armed Forces.

**Response:**    Undisputed.

**Defendants' Allegation of Fact No. 2:**

The AFRH is funded by Congressional authorization for funds to be expended from a Trust Fund held by the United States for operation of the AFRH.  The Trust Fund receives its revenues from money collected from monthly active

duty payroll deductions from enlisted soldiers (currently fifty cents per month), resident fees, fines and forfeitures from the Armed Forces, gifts, bequeaths, and interest earned on the balance of the AFRH Trust Fund. Each year Congress provides the AFRH with a lump sum appropriation from the Trust Fund.

**Response:**    The factual allegations in paragraph number two are not material to the claims in the Complaint as they do not concern the issue of whether Defendants satisfied their statutory duty to provide high-quality, on-site primary medical care and dental care to residents at the Home. The allegations also provide an incomplete description of the available sources of funds for the Trust Fund. The contribution of active duty enlisted personnel to the Trust Fund is not limited to a payroll deduction of fifty cents per month. In 1995, Congress authorized the Secretary of Defense to generate additional revenue at the Home by increasing the monthly active duty payroll deduction from enlisted soldiers from the current rate of 50 cents per pay period to one dollar per pay period. (See AFRH Chief Operating Officer Fact Sheet No. 1, attached hereto). If this increase were implemented, it would generate approximately $7 million in additional funds for the Home on an annual basis. Id. Despite this authorization, Defendants declined to exercise this authority to obtain these additional funds.

### Defendant's Allegation of Fact No. 3:

From 1995 until 2003 operating expenses of the AFRH had exceeded the revenues going into the Trust Fund held for operation of the AFRH. The balance of the Trust Fund had declined from $156 million in 1995 to $94 million dollars in 2003.

**Response:**    The factual allegations in paragraph number three are not material to the claims in the Complaint as they do not concern the issue of whether Defendants satisfied their statutory duty to provide high-quality, on-site primary medical care and dental care to residents at the Home. In addition, as noted in response to Defendants' Allegation of Fact No. 2, above, Defendants have another authorized source of funds, but have failed to exercise the right to

increase the monthly contribution from active duty enlisted personnel. Had Defendants implemented this increase in the payroll deduction for enlisted personnel, it would have generated at least $70 million in additional funds for the Trust Fund since 1995. See Response to Allegation of Fact No. 2.

**Defendant's Allegation of Fact No. 4:**

> The Home provides on site routine and emergency dental care as well as providing referrals to off-site dentists.

**Response:**    Plaintiffs dispute that the Home provides on-site routine and emergency dental care. Routine dental services that were previously provided are no longer offered to residents at the Home. For instance, in the past, the Home provided dental services such as extractions, root canals, and implants to the residents. The Home now refuses to provide these services, even when they are medically necessary. In February or March, 2005, the Home's dentist, Dr. Tillman, advised a resident that he needed to have a molar extracted. When the resident requested that Dr. Tillman extract the tooth, Dr. Tillman refused to perform the extraction. The resident then went to a private dentist to have the tooth extracted. He was required to pay for this service out of his own pocket. (Renzi Decl., attached hereto, ¶ 4).

The alleged fact that the Home provides referrals to off-site dentists is not material as the establishment thereof would not affect the outcome of this action. By law, the Home is required to provide on-site dental care, not referrals to dentists in the private sector.

**Defendant's Allegation of Fact No. 5:**

> Each resident of the Home is assigned one of the Home's 4 physicians as a primary care giver.

**Response:**    The allegation in paragraph five is ambiguous and lacks factual foundation.    This

alleged fact is supported only by a declaration which states that "[a]ll residents are assigned to

one of these providers when entering the home."  (Cox Decl. ¶ 6(b)).  The underlying declaration

does not state that all *current residents*, many of whom have lived in the Home for a decade or

more, have a regular physician.  In the past, residents of the Home were assigned a regular

physician.  With the resignation or other departure of a number of physicians, residents have not

been assigned new physicians – or have not been informed of their new physician.  (Renzi Decl.

¶ 3).


### Defendant's Allegation of Fact No. 6:

AFRH recently eliminated five physician assistant positions. The former
physician assistants were not certified and did not fully comply with required
healthcare standards.

**Response:**    Undisputed.


### Defendant's Allegation of Fact No. 7:

The AFRH provides twenty-four hour medical coverage.  A physician is
assigned to the Community Health Clinic, Monday through Friday, from
7:30am until 4:00pm.  After hours a Registered Nurse is in the Community
Health Clinic from 4:00pm until 12 midnight to assess and assist residents in the
independent setting.  After midnight a Registered Nurse is available.  A
physician is on-call between the hours of 4:00pm until 7:30am seven days a
week for consultation with the on duty nurse.

**Response:**    Defendants' allegation that "AFRH provides twenty-four hour medical coverage"

is ambiguous, vague and misleading.  The Home is required by law to provide high-quality, on-

site primary medical and dental care.  The vague representation that it provides "medical

coverage" does not provide probative evidence in the analysis of whether Defendants have

satisfied their statutory obligations.

The Home does not provide high-quality, on-site primary medical care 24 hours a day. A physician is only available on site to see patients from 7:30 a.m. until Noon and from 1:00 to 4:00 p.m. on Monday through Friday, or 37.5 hours a week. (See AFRH Chief Operating Officer Fact Sheet No. 8, attached hereto). During the remaining 130.5 hours in a week, there is no physician on-site. (Defendants' Statement, ¶ 7). The physician who is "on call" between 4:00 p.m. and 7:30 a.m. is not on-site and does not see patients during that period. (Rutherford Decl., attached hereto, ¶ 9; Murray Decl., attached hereto, ¶¶ 3, 5). Residents are denied access to a physician over the weekends. On Sunday, August 14, 2005, a resident who believed he was suffering a recurrence of a chronic condition requested medical assistance. He was informed that there was no physician available to treat him. (Murray Decl. ¶ 3).

The allegation that "after midnight, a registered nurse is available" is also vague, misleading, and immaterial to the question of whether the Home provides high-quality, on-site primary medical care. The stated policy at the Home is that, if an independent living resident requires medical attention in the middle of the night, they are instructed to call security, which notifies the supervisor on duty. The supervisor evaluates the situation and determines whether to call 911. (See AFRH Chief Operating Officer Fact Sheet No. 10, attached hereto). The Home does not reimburse residents for the cost of emergency transportation. (Rutherford Decl. ¶ 9).

### Defendant's Allegation of Fact No. 8:

AFRH-Washington provides residents after hours non-emergency transportation from 8:00 pm until 8:00 am at no cost. After hours non-emergency transportation will cover transportation to the Walter Reed Army Medical Center, the Veterans Administration, the Washington Hospital Center and Providence Hospital.

**Response:**     The Home does not provide after-hours transportation to residents who need primary medical care that is not provided at the Home. On Sunday, August 14, 2005, a resident

who believed he was suffering from a recurrence of prostatitis, after being advised that there was

no physician on-site to treat him, requested transportation to Walter Reed Army Medical Center.

The nurse on duty advised him that there was no available transportation and that he would need

to arrange for his own transportation or wait for the next day's regularly scheduled bus. (Murray

Decl. ¶¶ 3, 4).

 Nor does the Home provide after-hours transportation to local pharmacies. Because

prescription medications are not immediately available at the Home, and transportation to

pharmacies is not provided, residents have formed a voluntary carpool system to obtain newly-

prescribed prescriptions for fellow residents. The nurses at the Home routinely call members of

the carpool to request that they drive to the pharmacy to obtain medication for residents on the

day that it is prescribed. (Rutherford Decl. ¶ 6).

   **Defendant's Allegation of Fact No. 9:**

   The AFRH does not operate a pharmacy but provides Independent Living
   residents a medication room for medications obtained through prescription from
   Walter Reed Army Medical Center. Independent residents receive new
   medications the same day; however, refills take three days, which is consistent
   with the service delivery model used throughout the military. Long term care
   residents receive their medication through a contract pharmacy called
   Neighborcare. AFRH-Washington provides residents medications after hours in
   the Community Health Office free of charge. The Community Health Nurse
   calls the physician on-call should residents become ill after hours, on weekends,
   or on holidays.

**Response:**  The allegations in paragraph nine are vague, misleading, and immaterial to the

issues in this action. The contention that "[i]ndependent residents receive new medications the

same day" ignores the question of whether patients who are ill and require new prescription

medications have access to a provider on site that can prescribe prescription medications. The

majority of the time they do not. See Response to Defendant's Allegation of Fact No. 7. Even

if they are able to see a physician and the physician prescribes a new medication, the Home does

not provide the prescription medications on the day that they are prescribed. In order to obtain

the prescription, the resident must go to Walter Reed to have it filled or, if Walter Reed does not

carry the prescription, arrange for his or her own transportation and obtain it from a private

pharmacy. Because the Home does not provide adequate transportation, the residents have

formed carpools to assist others in obtaining their prescription medications. (Rutherford Decl. ¶¶

5-6). The nurses from the Home routinely call the operators of the carpool to request this

assistance. See Response to Defendant's Allegation of Fact No. 8. Indeed, the Declaration from

Mr. Cox upon which the Defendant's allegation of fact is based does not state that the Home

provides the prescription medications on the same day. In the Declaration, Mr. Cox only states

that "Independent residents *can* receive their medication the same day." (See also Fact Sheet

No. 8) (emphasis added). Thus, there is no basis for any factual finding that the Home provides

the prescriptions on the same day.

The assertion that "refills take three days, which is consistent with the service delivery

model available throughout the military" is not material to the issues in this action. Defendants

have a mandatory statutory duty to provide high-quality, on-site medical care, not to conform to

the service delivery models applicable in any other settings.

The statement that Long Term Care residents receive their medications through a contract

pharmacy called Neighborcare is not a material fact because it is not probative of the issue of

whether the Home provides high-quality, on-site primary medical care to its residents.

The Home does not provide residents with adequate access to medications after hours (or

on weekends) in the Community Health Center. At most, the Home keeps a few over-the-

counter medications in the Community Health Center. On Sunday, August 14, 2005, a resident

who believed he was suffering a recurrence of a chronic condition requested medication. His request was denied. The nurse on duty advised him that the only medication that they carried was "stuff for headaches." (Murray Decl. ¶ 4).

The statement that the "Community Health Nurse calls the physician on-call should residents become ill after hours, on weekends, or on holidays" is vague, misleading, and immaterial to the question of whether the Home provides high-quality, on-site primary medical care. This statement does not reference any material facts because it does not provide any evidence that a physician is available to provide high-quality, on-site primary medical care to residents during those hours. The stated policy at the Home is that, if an independent living resident requires medical attention in the middle of the night, they are instructed to call security, which notifies the supervisor on duty. The supervisor evaluates the situation and determines whether to call 911. (See Memorandum for All Independent Residents from Linda Rader, Administrator, Health Care Services Division, attached hereto; AFRH Chief Operating Officer Fact Sheet No. 10); (Rutherford Decl. ¶ 9). Patients are routinely denied access to a physician on the weekends. (Murray Decl. ¶ 3).

**Defendant's Allegation of Fact No. 10:**

> AFRH provides X-ray services through a contract vendor who comes to the resident's bedside or room. The resident's insurance is billed for the services and those who do not have insurance are covered by AFRH.

**Response:**    AFRH discontinued x-ray services in 2003 and contends that they were restored in May, 2005 by contracting with a vendor who comes to the resident's bedside or room. (See Cox Decl. ¶ 6(f)). Notwithstanding this announced change in policy, the Home still sends residents to other facilities for x-rays. On August 8, 2005, a resident who had dropped a heavy

item on his toe went to the walk in clinic and requested an x-ray. He was informed that x-rays were not available on site and was instructed to go to Walter Reed for an x-ray. He arranged for his own transportation to Walter Reed to obtain the x-ray. (Hill Decl., attached hereto, ¶ 4).

**Defendant's Allegation of Fact No. 11:**

AFRH provides EKG services upon a physician's request.

**Response:**    The Home does not provide adequate EKG services for residents. For example, on May 5, 2005, a resident awoke with a funny feeling in his tongue, left arm and left leg. Concerned that he may have had a stroke, he went to see the nurses in the Scott Building. The nurses reluctantly agreed to give him an EKG. After obtaining his medical records, the resident went to the walk-in clinic at the Home. The doctor there suggested that he go to Walter Reed. No one offered to arrange for his transportation. The resident then got into his own car and drove himself to Walter Reed. He was admitted at Walter Reed and given tests, which revealed that he had suffered a mild stroke. (Fisher Decl., attached hereto, ¶¶ 3, 4, 5 and 6).

**Defendant's Allegation of Fact No. 12:**

> AFRH provides on site psychiatric care. A psychiatrist from Walter Reed Army Medical Center comes to the Home one day per week for the entire day. A psychiatrist is available throughout the week at Walter Reed for any mental health needs of the residents. If residents need further psychiatric assistance, they are referred to the VA or Washington Hospital.

**Response:**    The Home does not provide adequate care for residents who require psychiatric care or other mental health services. The dementia ward at the Home lacks adequate staffing and equipment. Visitors to the dementia ward have found that there are no staff on the hall with the patients. In March, a physician at Walter Reed who regularly treated a resident from the

dementia ward for a routine procedure noted that the resident was not receiving proper hydration. According to nurses at the Home, the mortality rate in the dementia ward is very high. (Tsukano Decl., attached hereto, ¶¶ 6-8, 11, 13).

Respectfully submitted,

_____/s/_____
David H. Bamberger (D.C. Bar No. 362285)
J. David Folds (D.C. Bar No. 449791)
Dimitra D. Joannou (D.C. Bar No. 488973)
Mila Z. Zain (D.C. Bar No. 490282)
DLA PIPER RUDNICK GRAY CARY U.S. LLP
1200 Nineteenth Street, N.W.
Washington, D.C. 20036-2412
Phone: (202) 861-3900
Fax: (202) 223-2085

Attorneys for Plaintiffs



July 14, 2003

# AFRH Chief Operating Officer
# Fact Sheet No. 1

**The Premier Retirement Community for America's Veterans**

**Subject:** Rumors, Inaccuracies and Incomplete Information

**Applicability:** AFRH-Washington Residents

In recent months there seems to be a larger than normal amount of rumors and inaccurate information circulating the AFRH-Washington campus. Rumors create an environment of negativity and unnecessarily stress individuals who hear these rumors. In an effort to correct some of the inaccurate information currently circulating, I offer the following responses to specific rumors that have been brought to my attention.

**1. _Rumor:_** The 50 cent military payroll deduction increase hasn't happened and it appears that the Chief Operating Officer doesn't seem to be doing anything to make it happen.

**_Response:_** If the payroll deduction was approved tomorrow, I would be the first person to welcome it with open arms. However, when I (you) look at the history of this initiative I (we) need to be realistic. Congress "authorized" the additional 50 cent military payroll deduction increase as part of the National Defense Authorization Act of 1995. However, during the eight year period following its "authorization" it has not been "approved." My philosophy, as I have shared with each of you before, is that I need to take steps to control our own outcome. My staff and I need to explore and adopt initiatives that will bring revenue into the Homes and offset the $7M per year that the AFRH is not realizing from approval of the proposed additional 50 cent military payroll deduction increase. The AFRH Management Team must be good stewards of our resources. The Management Team needs to eliminate unnecessary expenses, streamline operations and make sound business decisions that will positively impact our Trust Fund without any degradation of service to our residents. The AFRH Management Team is currently implementing a plan that will get us exactly where we need to go. The bulk of our plan is scheduled to be implemented over the next 18 months.

Since we cannot fundraise like corporate America we only have a few choices to help us achieve our goal of achieving the level of financial stability we desire. Our options are: (1) seek appropriated funds, which has been attempted before with no success; (2) increase resident fees – which I choose _not_ to do, or (3) seek opportunities that will generate money for our Trust Fund, i.e., leasing of unused spaces. I believe we must take these necessary steps before the reality of the additional 50 cent increase occurs.

2. *Rumor*:   The AFRH management team plans to close the Washington Campus and move all the AFRH-Washington residents to the Gulfport facility.

*Response:*    **FALSE.**  There are no plans to move the AFRH-Washington residents to the Gulfport facility.  The Gulfport facility is 99% full at this time.

3. *Rumor:*    The AFRH management team is selling off all the AFRH-Washington campus land.

*Response:*    **FALSE.**  The only land that is being sold at the AFRH-Washington campus is the 49 acre parcel of land which Congress instructed us to sell/lease as part of the National Defense Authorization Act for 1995 .  We are in the final stages of selling the 49 acres.  Selling this property will bring additional revenue into our Trust Fund and ensure a healthier financial future for the AFRH and its residents.  No other land is being *sold* at the Washington campus.

In order to bring additional revenue to the AFRH Trust Fund, which is not only my commitment to the residents, but also my responsibility, I am exploring options to lease excess or underutilized buildings at the AFRH Washington campus.  In addition to bringing in additional revenue, leasing excess buildings and spaces will create opportunities for the Home and its residents to interact with the local community organizations.  Organizations who rent space from the AFRH will be responsible for paying utilities and paying all maintenance costs for the building(s) they occupy.  Utilities and maintenance will be *in addition* to monthly rent fees.  Having lessees pay for monthly rental fees, utilities and maintenance relieves us from paying these expenses.  We can then redirect the funds we saved to other requirements.  *The real plus of leasing unused buildings is that we gain additional revenue, but the AFRH still owns the land and the property the building is situated on.*

Currently we lease space to:  The Army Corps of Engineers, the National Trust for Historic Preservation, and the Smithsonian Institution.  We are currently exploring lease agreements with the Charter School System, the U.S. Vets Organization, the Veteran's Administration and the Washington Hospital Center.

4. *Rumor:*   Under the new Health Services model residents at AFRH-Washington will have to get their own doctors.

*Response:*    **FALSE.**  Residents will continue to have access to the services of qualified doctors at AFRH.  Residents will also continue to have access to doctors at the Walter Reed Army Hospital and the Veterans Administration.  However, if residents choose to be seen by private physicians of their choice they can to do so, but, expenses must be incurred by the resident.

2

5. ***Rumor:*** Transportation to the Walter Reed Army Hospital will be eliminated.

    ***Response:*** **FALSE.**

6. ***Rumor:*** AFRH residents are losing services.

    ***Response:*** **FALSE.** I am committed to protecting the care and services you currently receive. In fact, as the Chief Operating Officer, my goal is to <u>improving</u> the level of service our residents receive. This goal will not occur overnight, but working with the AFRH Management Team we continue to make steady making progress on a daily basis. It is important to note, however, that in order to improve the service(s) residents receive, there may be a change in the method of how services are delivered.

7. ***Rumor:*** *All* the current AFRH-Washington civil service employees will be eliminated and *all* positions will be contracted out.

    ***Response:*** **FALSE.** It is true that the AFRH is planning to reduce the size of its civilian workforce, but our workforce of the future will still be mostly Federal civil servant employees. The AFRH Management Team is exploring having certain operations such as food service and grounds maintenance (i.e., snow removal, etc.) competitively outsourced (having private vendors bid to perform a given function). We will better be able to provide complete information to residents on what operations will be contracted out later this year.

8. ***Rumor:*** Having the Food Service and Dining Administrator travel between the two Homes is costly and unnecessary.

    ***Response:*** Ms. Rachel Hatten has been appointed as the Agency's Food Service and Dining Administrator. Ms. Hatten reports directly to the Chief Operating Officer. Rachel is an expert in her field and has successfully managed the Food Service and Dining operation at the Gulfport facility.

    <u>*Instead of having two identical billets at each Home, which is twice as expensive, I have decided to have Ms. Hatten be the Food Service and Dining Administrator for both Homes*</u>. Although there will be a moderate amount of travel expenses required for Ms. Hatten to travel between both facilities, this is <u>far</u> less expensive than having two full time employees on the AFRH payroll doing the same job. Having one Administrator will also ensure consistency of services and the same level of food service quality at each Home.

9. ***Rumor:*** The Deputy Director positions at each Home are being filled by military member and the Washington Home will have a Navy military member as the Deputy.

3

*Response:*    **TRUE.** As Chief Operating Officer I have selected military members to serve as Deputy Directors at both the AFRH-Washington and AFRH-Gulfport facilities. Having military Deputy Directors is consistent with the guidance of the National Defense Authorization Act for 2002. Additionally, senior members of the Department of Defense and the Deputy Chiefs of Staff for Personnel of the Military Services also support our efforts on this issue.

CDR Paul Soares, USN, has been selected to be the Deputy Director of AFRH-Washington and LtCol Wendy Van Dyke, USAF, has been selected to be the Deputy Director of AFRH-Gulfport. CDR Soares will report in early August and LtCol Van Dyke will report in mid-July.

Since residents of all Services reside at both campuses, I decided to have an Air Force member assigned to the Gulfport facility and a Navy member assigned to the Washington facility. This mix will better represent all the serviced population at both Homes.

**10. *Rumor:*** The Ignatius Guest House will no longer be available to guests visiting residents and there is a plan to lease the Ignatius to an organization who deals with rehabilitation of drug users. The individuals who are being rehabilitated will have full range of movement on our campus and will potentially be a threat to the current residents.

*Response:*    It is **TRUE** that the Ignatius Guest House will no longer be available for guests visiting AFRH-Washington residents. We are, however, making available 10 rooms available to visiting guests in the Scott Building which will replace the lost spaces at the Ignatius Guest House.

It is also **TRUE** that we are entertaining a short-term pilot project with an organization called Cloudbreak, DC, LLC, who will house 24 of their residents in the Ignatius Guest House spaces. The AFRH Trust Fund would receive a set monthly rent from Cloudbreak, DC, LLC, and they would be responsible for utilities and any required maintenance. Again, this is a lease arrangement only, the AFRH will still own the Ignatius Building and the land that Ignatius sits on. I would just like to mention that it currently costs approximately $170,000 a year for AFRH to operate the Ignatius Guest House. However, we only received $90,000 in incoming revenue (rental fees). This leaves a deficit of $80,000 which is currently paid out of the Trust Fund. This is not good business, and we need to turn it around. By leasing the Ignatius we will have a cost avoidance of the $80,000 (previously taken out of the Trust Fund), plus our goal is to actually realize a positive cash flow from this initiative (future rent to be paid by leasee).

First, let me tell you that Cloudbreak, DC, LLC, provides services to veterans who are recovering drug and alcohol users. These veterans are referred to Cloudbreak by a transitional housing program and/or a Veterans Administration program. All of their residents have significant clean/sober time – most an average of 12-18 months, or

4

longer. Most of Cloudbreak's residents are working and pay 30% of their monthly income to Cloudbreak. These residents do not have a free ride. The Cloudbreak coordinator states that their residents are excited about helping to build a good program and understand the need to set a positive example. They realize that overcoming pre-conceived ideas about them will be a challenge. The coordinator also offers that these veterans should be considered very stable individuals. Cloudbreak will have 24 hours a day, 7 days a week administrative in-house coverage in the Ignatius building.

11. **_Rumor:_**   Some sort of School is moving into the old Grant Building. Having a school on the AFRH-Washington property will have a negative impact on the AFRH-Washington residents.

   **_Response:_**   TRUE. The AFRH Management Team is in formal negotiations with the DC Charter School system. There are actually two schools who will compose the Charter School, Tri-Community, DC Prep. These schools are interested in the Grant Building (which has set vacant for many years), and the former Security Office Building (security team has relocated to basement of Sherman Building). Leasing space to the Charter School System also creates a positive revenue source for the AFRH Home. Representatives of the AFRH and the Charter School System are currently meeting to discuss how this initiative can be implemented here at AFRH-Washington, as well as iron out all the outstanding issues surrounding a venture of this type. A Charter School presence could occur as early as this Fall.

   Properly managed, we believe these tenants will prove to be an asset to our campus vice creating a negative environment.

12. **_Rumor:_**   Management is doing nothing to get a Dental Hygienist hired.

   **_Response:_**   FALSE. Although we have had some false starts (i.e., a very limited number of applicants and applicants who did not meet specified criteria) we are now confident that we will have a full-time Dental Hygienist hired during the month of July (report date will be late July/early August 2003.

   _Timothy C. Cox_

   Timothy C. Cox
   Chief Operating Officer



May 31, 2005

**AFRH Chief Operating Officer**
**Fact Sheet No. 8**

**AFRH**
The Premier
Retirement Community
for America's Veterans

**Subject:  AFRH-Washington Healthcare Services**

In order to ensure that each Armed Forces Retirement Home Washington resident clearly understands the Healthcare services available to them, the following information is provided.

**Dental Services:**  Residents in Independent Living receive check-ups when requested by appointment.  Dental Care is provided on a routine basis for Assisted and Long Term Care residents.  Emergency walk-in clinic is handled every morning on a daily basis.  To accommodate the resident needs, the dental clinic was relocated to independent living to provide enhanced and more accessible dental services.  Residents in Long Term Care receive annual check-ups.  Extensive dental needs are handled by referrals.

**Mortuary Services:**  The Mortuary, previously on-site at AFRH, was never a true mortuary since it never had the capability of embalming or cremating bodies.  Bodies were taken to local mortuaries and prepared for burial and then transported back to AFRH and stored in a refrigerated cooler until time of burial.  In the former model, AFRH staff members acted only as intermediaries, they were not credentialed or licensed morticians.  Currently deceased residents are immediately transferred to a local mortuary for embalming or cremation.  Funeral arrangements are handled through the local mortuary.  Mortuary staff work with the family members to ensure all wishes are carried out.  Residents have the option of a full military burial at Arlington National Cemetery or a choice of their designated burial site.

**Pharmaceuticals:**  Independent Living has a medication room for medications obtained through prescription from Walter Reed.  Independent residents can receive their medication the same day; however, refills will take three days, which is consistent with the service delivery model used throughout the military.  Residents are responsible for ensuring that they have a seven day reserve of medications at all times.  In the private sector an on-site pharmacy is not available for residents in independent living.

Long Term Care residents receive their medication through a contract pharmacy called Neighborcare.  Medications come in unit-dose packaging which provides a safe and accurate administration system.  Residents' supplemental insurance is billed for the medications monthly.  Medication costs for those residents who do not have supplemental insurance are paid by the home.

**Treatment Room:**  Until 2003 the home's treatment room was staffed by a physician 24 hours a day.  Currently, a physician is assigned to the Community Health Clinic, Monday through Friday, from 7:30am until 12 noon to see all walk-in residents.  There are scheduled appointments from 1:00 pm to 4:00 pm.  After hours a registered nurse is on duty, in the

Health Center, from 4:00 pm until 12 midnight, to assess and assist residents in the independent setting. The Registered Nurse assesses the resident's medical status, treats the resident or calls 911. In case of an emergency; i.e., shortness of breathe or chest pain, residents are encouraged to call 911 and not wait for the nurse. A provider is on-call between the hours of 4:00 pm until 7:30 am seven days a week for consultation with the nurse. After midnight a Registered Nurse is available

**Doctors on Staff**: Currently, AFRH has 4 physicians and 2 Nurse Practitioners. All residents are assigned to one of these providers when entering the home. Appointments are set up with their providers through a centralized in-house appointment system. The Medical Director on staff collaborates with both internal and external providers when needed. Residents have access to physicians at the Walter Reed Medical Center, the Veterans Administration and local hospitals. Residents have freedom of choice in choosing physicians in the private sector. While five Physician Assistant positions were eliminated, in the current model residents are seen by a physician vice a Physician Assistant. The former physician assistants were not certified and did not fully comply with required healthcare standards. This lack of certification was specifically challenged by the Inspector General in their last inspection.

**X-Rays and EKGs**: In 2003 AFRH Washington discontinued the use of available in-house X-Ray equipment. It was determined at that time that the equipment was very old, could not be repaired, and was unsafe. It was felt that this outdated equipment potentially was a health hazard to residents and staff. During the transition period X-ray services continued to be available at Walter Reed and the VA. Since May 1, 2005, X-ray services are provided by a contract vendor who comes to the resident's bedside or room. The resident's insurance is billed for the services and those who do not have insurance are paid for by the home. EKG services are available, upon physician's request, and are provided by the home. Residents with chest pain are immediately sent to the Emergency Room.

**Recent Renovation**: We have also renovated space in the Scott Building (geographic center for our resident population in independent living) to consolidate Dentistry, Optometry, Community Health, Ambulatory Care and Medical Records all in the same area vice being dispersed among three buildings. These buildings were a significant distance from each other. By doing this we have centralized care and made services far more convenient and available for the residents.

If you missed the grand opening of the new Dental Clinic and the Optometry Clinic located in the Scott Building, please take a few minutes and pay a visit to these areas – they are state-of-the-art and have been designed specifically for you. The relocation of these new spaces confirms our commitment to provide improved quality services to each resident.

Timothy C. Cox
Chief Operating Officer

Distribution: AFRH-W Residents and Staff



July 11, 2005

**The Premier**
**Retirement Community**
**for America's Veterans**

# AFRH Chief Operating Officer
# Fact Sheet No. 10

**Subject:    Availability of After Hours Non-Emergency Transportation and After**
**Hours Medication at AFRH-Washington**

## After Hours Transportation:

Effective immediately, after hours non-emergency transportation will be available for AFRH-Washington residents from 8:00pm until 8:00am. This service will be available Monday through Friday, weekends and holidays. If you need non-emergency transportation, in the middle of the night, you must **call Security on x3111.** Security will notify the supervisor on duty. The supervisor will come to your room to evaluate the situation and determine if you can be transported via regular transportation or if "911" needs to be called. If you are unable to get transportation back from the acute care hospital, **call Security on (202) 730-3111** and we will send a van to pick you up. The name of the company who will be providing after hours non-emergeny transportation services is "Dependable."

After hours non-emergency transportation will cover transportation to **the Walter Reed Army Medical Center, the Veteran's Administration , the Washington Hospital Center and Providence Hospital.** Please note that this service is for *non-emergency* needs that occur between the hours of 8:00pm and 8:00am. There is no cost to the resident for this transportation.

## After Hours Medications:

Effective immediately AFRH-Washington residents will now have medications available to them after hours in the Community Health Office. The community health nurse will call the physician on-call should you become ill after hours, weekends and holidays. Medications will be available during the hours of 4:00pm and 8:00am when the clinics are closed. There is no cost to the resident for these medications.

We are committed to providing the best level care and service delivery to our residents. If you have comments or questions, please contact Dr. Linda Rader, PhD on (202) 730-3323.

*Timothy C Cox*

Timothy C. Cox
Chief Operating Officer

Distribution:
AFRH-W Residents and Staff

## MEMORANDUM FOR ALL INDEPENDENT RESIDENTS

## TRANSPORTATION-After Hours

Beginning Friday, 8 July 2005, transportation will be available from 8:00pm until 8:00 am. Monday through Friday, weekends and holidays. If you have an emergency, in the middle of the night, you must call security. Security will notify the supervisor on duty. The Supervisor will come to your room to evaluate the situation and determine if you can go via regular transportation or if "911" needs to be called. If you are unable to get transportation back, from the acute care hospital, call security and we can send a van to pick you up. After hours transportation will cover WRAMC, VA, WHC, and Providence Hospitals.

## MEDICATIONS-After Hours

Emergency medications are now available, in the Community Health Office, to meet your needs when clinics are closed. The community health nurse will call the physican on-call should you become ill after hours, weekends, and holidays.

Linda Rader. RN, PhD
Administrator
Health Care Services Division

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MARTIN CODY, et al.** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) **Civil Action No. 05-1041 (RJL)** |
| | ) |
| **DONALD RUMSFELD,** | ) |
| **Secretary of Defense, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

## DECLARATION OF BENEDETTO RENZI

1.      My name is Benedetto Renzi.  I am over 18 years of age and have personal knowledge of the facts set forth herein.

2.      I am retired from the United States Air Force.  I served three tours of duty in Vietnam.  For the last five years, I have resided at the Armed Forces Retirement Home in Washington, D.C. (the "Home").

3.      I have had several health problems that required attention at the Home.  I have high blood pressure and high blood sugar.  Previously, these conditions were monitored under the care of Dr. Ko.  After she resigned earlier this year, I have not been assigned a new physician.  When I require prescription medications, I go to Walter Reed Army Medical Center or to the Veterans' Administration Hospital to get them filled.

4.      Earlier this year, I went to see the Home's dentist, Dr. Tillman, for a check up and to get my teeth cleaned.  Dr. Tillman advised me that I had a molar that needed to be extracted. Previously, this type of service was provided at the Home.  When I asked her to extract the tooth for me, Dr. Tillman said she was too busy and refused to provide the extraction.  I had to go to a

private dentist downtown to get the molar removed and two implants.  This cost me $5,400 out-of-pocket.

I hereby declare and affirm, subject to the penalties of perjury, that the foregoing statement is true and correct.

Dated: September 2/, 2005

Benedetto Renzi

I WENT DOWN TOWN TO THE DENTIST LIKE SUJESED BY DR. TILLMAN. SHE WOULD NOT LET ME TAKE MY DENTAL RECORDS. SO I HAD TO PAY FOR A LOT OF THINGS TWICE THAT I SOULD HAD TO PAID AT ALL

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MARTIN CODY, et al.** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| v. | ) **Civil Action No. 05-1041 (RJL)** |
| | ) |
| **DONALD RUMSFELD,** | ) |
| **Secretary of Defense, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

## DECLARATION OF HOMER RUTHERFORD

1.      My name is Homer Rutherford.  I am over 18 years of age and have personal knowledge of the facts set forth herein.

2.      I retired from the United States Air Force in 1969 as a Senior Master Sergeant with 23 years of active-duty service.  I have been a resident of the Armed Forces Retirement Home in Washington, D.C. (the "Home") since June, 2002.  I am a member of the Home's Resident Advisory Committee.

3.      During the last few years, there has been a noticeable decline in the quality of medical care available to residents at the Home.  In February, 2005, I met personally with representatives of the Department of Defense to raise specific concerns about the medical care at the Home.  On March 11, 2005, we received a written response from the Department of Defense. The Department of Defense made no commitment to make any changes in response to our concerns.

4.      Previously, the Home maintained a pharmacy where residents could obtain prescription medications the same day that they were prescribed.  This service is no longer

available. Now, most prescriptions are filled at Walter Reed Army Medical Center. Unless the resident goes in person to pick up the prescription, it typically takes three days to receive them. The only transportation that the Home provides is a shuttle service to Walter Reed, the VA Hospital, and Washington Hospital Center, with limited hours. In many cases, the limited transportation provided is not an option for residents who are feeble, ill, or confused. When a prescription cannot be filled at Walter Reed, residents obtain the prescriptions at local pharmacies. The Home does not provide transportation to the local pharmacies.

5.      The pharmacy services at the Home have been inadequate for me. When I was diagnosed with pneumonia in 2004, I was prescribed oxygen and an antibiotic and told that I needed to take them immediately. The Home did not have the oxygen. As I could not get it that day, I borrowed oxygen and equipment from another resident. The staff advised me that I would need to get someone to take me to Walter Reed to pick up the medication, or I would need to wait for three days until they could have it delivered to me. I had someone pick up the prescription for me at Walter Reed.

6.      Because the Home does not actually deliver prescriptions to the residents on the day they are prescribed, last year I joined with a number of residents who own cars to form a volunteer carpool system to pick up prescriptions for residents who require their medicine immediately. When residents require emergency medications, a nurse from the Community Health Center calls one of the members of the carpool group. The driver will then pick up the resident patient (or their identification card) and drive to Walter Reed (in his personal car and at his personal expense) to obtain the medication for the resident. The nurses typically call once or twice a week for this voluntary service. The nurses have continued to call for this service throughout the summer of 2005.

7.     When the volunteer drivers formed this carpool group, Ms. Mimi Rivkin, a resident who served as the Chair of the Residents' Advisory Committee (the "RAC"), went to the ombudsman at the Home and requested that the carpool group be organized through the RAC. She was told by the ombudsman that it could not be organized through the RAC because of liability concerns.

8.     Recently, the Home's Chief Operating Officer issued Fact Sheet Number 10 on the subject of after hours transportation and medications. This fact sheet states that the Home maintains "medications" on-site for emergency purposes. This is an overstatement and does not fairly describe the situation. The nurses have informed residents that the Home only maintains a few over the counter medications for such purposes. The same fact sheet asserts that the Home provides after-hours, non-emergency transportation services for residents. This statement is also incorrect.

9.     Another fact sheet (Fact Sheet No. 8) describes the policy for obtaining medical services after hours at the Home. In practice, if a resident requires medical assistance during the middle of the night, the resident is instructed to call the Security Supervisor (not a licensed health care provider), who will call the nurse on duty and between the two of them they make a determination as to whether 911 should be called. If they call 911, an ambulance comes to take the resident to the emergency room at an off-site hospital. The Home does not pay for the emergency transportation. Residents have frequently been billed hundreds of dollars for this transportation.

10.     Fact Sheet No. 8 also states that the dental clinic was relocated to Independent Living to provide "enhanced and more accessible dental services." The clinic is tiny. In fact,

when it was built a wheel chair could not fit through the door or around the dental chair, although it has now been corrected.

I hereby declare and affirm, subject to the penalties of perjury, that the foregoing statement is true and correct.

Dated: September **21** , 2005

Homer Rutherford

4

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MARTIN CODY, et al.** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| v. | ) **Civil Action No. 05-1041 (RJL)** |
| | ) |
| **DONALD RUMSFELD,** | ) |
| **Secretary of Defense, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

## <u>DECLARATION OF WILLIAM A. MURRAY</u>

1.      My name is William A. Murray.  I am over 18 years of age and have personal knowledge of the facts set forth herein.

2.      In December, 1972, I retired from the United States Air Force after 21 years of service, including a tour of duty in Vietnam in 1967.  I have been a resident at the Armed Forces Retirement Home in Washington, D.C. (the "Home") since 1980.

3.      I suffer from several medical conditions and am 100% disabled.  Among other things, I have been diagnosed with chronic prostatitis.  On Sunday, August 14, 2005, I was suffering symptoms indicating a recurrence of prostatitis.  As I believed that I needed immediate treatment to prevent the onset of this condition, I went to the Home's nursing station at about noon, reported my symptoms, and asked to see a physician.  The nurse advised me that there was no physician on duty.

4.      I repeated to the nurse that I suffered from chronic prostatitis and believed that I needed antibiotics.  She responded by saying that the only medication that they carried was "stuff for headaches."  I then requested transportation from the Home to Walter Reed Army Medical Center so that I could receive treatment.  The nurse responded that there was no available

transportation at the Home and that I would either need to arrange for my own transportation or wait for the next day's regularly-scheduled bus to Walter Reed.

5.    Previously, the Home had a 24 hour treatment room that was staffed by emergency personnel.  There was always a physician on duty and on site at the Home.  If a resident had an emergency medical condition, this medical staff was available to come to the resident's room 24 hours a day.  The Home also had two ambulances that it used to transport residents, when needed, to other facilities.  These services are no longer available.

6.    During the last few years, I have observed a serious decline in the quality of medical care for residents at the Home.

I hereby declare and affirm, subject to the penalties of perjury, that the foregoing statement is true and correct.


Dated: September 21, 2005

William Murray

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MARTIN CODY, et al.                      )
                                         )
        Plaintiffs,                      )
                                         )
    v.                                   )  Civil Action No. 05-1041 (RJL)
                                         )
DONALD RUMSFELD,                         )
Secretary of Defense, et al.,            )
                                         )
        Defendants.                      )

## DECLARATION OF EUGENE HILL

1.    My name is Eugene Hill. I am over 18 years old and have personal knowledge of the facts set forth herein.

2.    I retired from the military in 1969 after serving nearly twenty years in the United States Army and the United States Navy. I served in the Korean War and served two nine-month tours of duty in the Vietnam War. In March, 2004, I became a resident of the Armed Forces Retirement Home in Washington, D.C. (the "Home").

3.    I generally do not require the use of the medical services at the Home as I prefer to use herbal and natural remedies for illnesses and other medical needs. I am, however, aware of the medical services available at the Home.

4.    On one recent occasion, I did seek medical assistance at the Home. In early August, 2005, I dropped a heavy steel door on my toe. Concerned that my toe may have been broken, I went to sick call at the Home to request an x-ray. I was advised that I could not get an x-ray at the Home, but that I could go to Walter Reed Army Medical Center to get an x-ray on my toe. I went to Walter Reed to get the x-ray.

I hereby declare and affirm, subject to the penalties of perjury, that the foregoing statement is true and correct.

Dated: September 17, 2005

Eugene Hill

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MARTIN CODY, et al.                    )
                                       )
      Plaintiffs,                 )
                                       )
      v.                          )  Civil Action No. 05-1041 (RJL)
                                       )
DONALD RUMSFELD,                       )
Secretary of Defense, et al.,          )
                                       )
      Defendants.                 )

## DECLARATION OF WALT FISHER

1.      My name is Walt Fisher. I am over 18 years of age and have personal knowledge of the facts set forth herein.

2.      I retired from the United States Air Force in 1974. Since 1984, I have been a resident of the Armed Forces Retirement Home in Washington, D.C. (the "Home").

3.      When I woke up on May 5, 2005, my tongue, left arm, and left leg all felt funny. I was concerned that I may have had a stroke. I went to see the nursing staff at the Scott Building at the Home. I told the nurse my symptoms and asked for an EKG. At the time, the nurse was preoccupied with delivering a shipment of blood to Walter Reed Army Medical Center. She reluctantly agreed to give me an EKG.

4.      After the nurse gave me the EKG, I picked up my medical records and went to the walk in clinic to see the doctor at the Home. I had to wait for a number of people who were ahead of me. The doctor reviewed the EKG and suggested that I go to Walter Reed.

5.      No one offered to arrange for transportation for me to get to Walter Reed. I got into my car and drove myself to Walter Reed.

6.    I went to Walter Reed and given additional tests, which confirmed that I had suffered a mild stroke.  I checked into Walter Reed and remained overnight.

7.    The treatment that I received in May, 2005 is very different from the treatment I received at the Home after I suffered a heart attack in 1985.  At that time, I received excellent treatment.

I hereby declare and affirm, subject to the penalties or perjury, that the foregoing statement is true and correct.

Dated: September _21_, 2005

*Walter E. Fisher*
Walt Fisher

2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MARTIN CODY, et al.** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| v. | ) **Civil Action No. 05-1041 (RJL)** |
| | ) |
| **DONALD RUMSFELD,** | ) |
| **Secretary of Defense, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

## DECLARATION OF JUDY TSUKANO

1.      My name is Judy Tsukano.  I am over 18 years of age and have personal knowledge of the facts set forth herein.

2.      My husband, John T. Tsukano, was a veteran of the United States Army.  He served as an infantryman in the European Theater during World War II, and was awarded a Purple Heart.  In July, 1999, John moved into the Armed Forces Retirement Home in Washington, D.C. (the "Home"), where he lived until his death on July 20, 2005.  During that period, I visited him at least once a week, usually on Saturdays.

3.      John suffered from dementia.  Shortly after he entered the Home, he was moved into the dementia ward in the Pipes Building.

4.      For the first few years that John was in the Home, I was happy with the care that he received.  More recently, the quality of care has declined.  In November, 2004, John had an illness that required pain medication.  I met with the physician on duty, who assured me that he would examine John and order the medication necessary to give him relief from his pain.  When I visited John the next day (day two), I learned that he was still suffering and had not received pain medication (other than over the counter medication, which was inadequate).  Because of his

allergy to codeine, the pharmacist was unable to fill his prescription without an override from the physician on duty. The physician on duty declined to give that instruction or to prescribe a non-codeine pain medication and referred the matter to Dr. Lopez, the physician who would be on duty the following day (day three). The following day (day three), I spoke with Dr. Lopez, who assured me that he would examine John and, if necessary, order a stronger pain medication than the over-the-counter drugs he was receiving. I did not hear back from Dr. Lopez. When I called the next morning (day four), I was incorrectly informed that Dr. Lopez was no longer taking care of patients on John's floor. John still had not received the necessary pain medication and his pain continued until weeks later when the cause was diagnosed by the doctors in Urology at Walter Reed Medical Center. John had kidney stones that had migrated to his bladder.

5.      In February, 2005, John was moved from the Pipes Building to the fifth floor of the LaGarde Building in the King Health Center. By this time, John was unable to feed himself and had to be hand fed by a care provider.

6.      On Saturday, February 12, 2005, I went to visit John in the LaGarde Building. When I arrived, I could not find a nurse or any staff persons on John's hall. I searched for the nurses and eventually found that all of the nurses and aides were in the break room. Before I left that day, two of the nurses suggested that I hire a private duty nurse to care for John during the day shift. I inquired about doing so, but did not have the financial resources to pay for a private duty nurse.

7.      John lost a significant amount of weight when he was on the fifth floor in LaGarde. On March 21, 2005, I took John for his regularly-scheduled appointment in the Urology Center at Walter Reed Army Medical Center, where he was scheduled to undergo a stint exchange, a procedure that he had undergone periodically for years. The physician at Walter

Reed was very familiar with John and his condition. After the procedure, the physician came to speak with me and commented that the stint was encrusted with stones and that it would not have been so encrusted if John were receiving proper hydration.

8.      In April, 2005, John's son arranged for him to be returned to the dementia unit, which had been moved to the second floor at LaGarde, where he would be with the staff that was familiar with his condition and needs. During one of my subsequent Saturday visits, one of the nurses commented that John was "the only one to come back to us." When I asked what she meant, she stated that four or five other men had been moved to LaGarde's fifth floor at the same time as John and that all of the others had passed away.

9.      On July 12, 2005, I received a call from an emergency room physician at the Veterans' Administration Hospital. John had been brought in by ambulance from the Home. No one at the Home called me to advise me of the situation (even though I had provided them with my contact information on multiple occasions and had asked to be informed if there were any changes at all in his condition). Immediately after receiving the call, I went to the hospital to see John.

10.     The emergency room physician informed me that John had developed gangrene due to peripheral artery disease and that his foot would need to be amputated. Previously, no one at the Home had informed me that John had gangrene. When I met with the surgeon, I learned that, by the time John was sent to the VA Hospital, the gangrene had already invaded his entire body and that, even if his leg was amputated above the knee, his situation was still life threatening. After conferring with several doctors at the VA Hospital, I decided not to authorize the amputation. The following day I met with more doctors from the outstanding Palliative Care

team at the VA. John was provided with pain medication (morphine) and made as comfortable as possible. He died on July 20, 2005.

11.     During the time that John was a resident at the Home, I observed a general decline in the quality of the care and the facilities at the Home. More and more of the services at the Home were being contracted out instead of being handled by regular employees. The decrease in the quality was readily apparent to me. The quality of food went down, and I was told by the staff on John's floor that trays had arrived with undercooked chicken and raw eggs. Fewer people had to handle more tasks and the new people didn't seem to care as much as those who had left. One staff member who had cared for John and recently resigned told me in confidence: "Judy, I just can't take it anymore."

12.     John did not receive the health care that he required and was promised to him at the Home. When John was placed in a wheel chair, I was promised physical therapy which would allow him to retain enough mobility to allow him to stand and be transferred from his bed to the wheel chair. He did not receive the physical therapy, and subsequently lost the use of his feet and was bed bound.

13.     The wheel chairs available for the residents on John's hall were not maintained; many were missing arm rests or foot rests, and the wheels didn't operate properly. I had to arrange for a private wheel chair for John. In the LaGarde Building at King Health Center, the air conditioner did not regulate the temperature properly, and it was frequently very cold inside, regardless of the temperature outside. On at least one occasion, I saw a staff member wrapped in a blanket as she went about her duties on the ward which housed elderly residents with dementia and, commonly, poor blood circulation.

I hereby declare and affirm, subject to the penalties of perjury, that the foregoing statement is true and correct.


Dated: September __8__, 2005


_____ Judy Tsukano
Judy Tsukano