# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**MARTIN CODY, et al.**        )
                            )
        **Plaintiffs,**        )
                            )
        **v.**              )  **Civil Action No. 05-1041 (RJL)**
                            )
**DONALD RUMSFELD,**    )
**Secretary of Defense, et al.,**  )
                            )
        **Defendants.**      )

## PLAINTIFFS' OPPOSITION TO
## DEFENDANTS' RENEWED MOTION TO DISMISS

Plaintiffs, through counsel, hereby oppose Defendants' Renewed Motion to Dismiss (the "Renewed Motion to Dismiss"), and state as follows:

### INTRODUCTION

Defendants in this case have claimed repeatedly that medical and health care services provided by the Armed Forces Retirement Home (the "Home") meet the needs of its residents, that the Home's policies have never been in violation of federal law, and that its services have even exceeded statutory requirements. In their Renewed Motion to Dismiss, Defendants now point to amendments to the Home's governing statute, 24 U.S.C. § 413, which they argue render Plaintiffs' claims moot. Yet, Defendants' arguments ignore both the overall statutory duty created by § 413 and the Home's actual health care practices. Indeed, the amendments cited by Defendants demonstrate Congress's recognition that care at the Home has **not** been adequate; the very amendments Defendants claim ratify their existing practices are entitled "*Improvement* in

Health Care Services for the Residents of Armed Forces Retirement Home." Defendants insistence on parsing the statute in a way that justifies the inadequate services they do provide ignores the import of the statute as a whole. Congress intended that the retired and former veterans and members of the Armed Forces who reside at the Home, many of whom are elderly and many of whom have immediate and chronic medical and health care needs, would have those needs met.

This case is not moot because Defendants continue to ignore § 413's mandate that the Home shall provide for the overall health care needs of the residents, including providing high quality, on-site primary medical and dental care. The care the Home provides continues to fall far short of that standard, and, as explained below, the violations asserted in the Complaint continue to present a live controversy requiring this Court's attention.

**ARGUMENT**

**THE COURT SHOULD DENY THE RENEWED MOTION TO DISMISS.**

**A.    Mootness Is A Heavy Burden Which Defendants Cannot Meet.**

The Renewed Motion to Dismiss should be denied because Defendants fail to meet the heavy burden of proving that this action is moot. "A case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Vietnam Veterans of Am. v. Principi*, 2005 WL 901133 (D.D.C. March 11, 2005) (internal citations and quotations omitted). "The burden of establishing mootness rests on the party raising the issue and it is a heavy burden." *Id.* (citing *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)). Dismissal "on grounds of mootness would be justified only if it were absolutely clear that the litigant no longer had any need of the judicial protection that it sought." *Adarand Constr., Inc. v.*

*Slater*, 528 U.S. 216, 224 (2000) (holding subcontractor's action not mooted by amended certification procedures enacted after initiation of lawsuit).

Defendants argue that amendments to 24 U.S.C. § 413, which added two additional subsections, (c) and (d), render the statutory violations cited in the Complaint moot. In selectively citing these new subsections of § 413, Defendants completely ignore the portions of the statute that Congress did not change and that remain in effect, unaltered, since the time this action was filed. Specifically, § 413(b), entitled "Medical and dental care-," establishes the overall standard regarding the availability and quality of health care services for residents of the Home. This standard remains intact, imposing a statutory duty on the Home by commanding:

> The Retirement Home **shall provide for the overall health care needs of residents in a high quality and cost-effective manner, including on-site primary care, medical care, and a continuum of long-term care services.** Secondary and tertiary hospital care for residents that is not available at a facility of the Retirement Home shall, to the extent available, be obtained by agreement with the Secretary of Veterans Affairs or the Secretary of Defense in a facility administered by such Secretary.

24 U.S.C. § 413(b) (emphasis added). Subsections (c) and (d) must be read in the context of the overall mandate in the unchanged portion of the statute that the Home "shall provide for the overall health care needs of residents in a high quality manner . . . ." Additionally, the statute continues to create a duty for the Home to provide "on-site primary care, medical care, and a continuum of long-term care services," as well as secondary and tertiary hospital care that is not provided on-site. When read as a whole, the recent amendments do not change these continuing obligations on the Home to provide on-site, high quality health care for its residents.

*Vietnam Veterans of America v. Principi*, decided recently by this Court, presents an instructive and analogous example. The plaintiff there sued the Department of Veterans Affairs

("VA"), regarding a 2002 memorandum issued to all regional directors of the Veterans Health Administration ("VHA"), which prohibited marketing geared towards increasing enrollment in the benefits provided by the VHA. The plaintiff claimed that the memorandum violated various statutes that required the VA and VHA to advise veterans of their eligibility for benefits and provide assistance to veterans and dependents in obtaining those benefits. 2005 WL 901133, at *1-2. The defendant argued that the suit was moot after the Undersecretary for Health and Operations issued a subsequent 2004 memorandum that instructed all regional directors to ensure that their facilities were compliant with their statutory responsibilities. *Id.* at *2. This mandate, argued the defendant, extinguished any claims that prior policies resulted in the VA's failure to meet those duties. This Court disagreed, holding that the 2004 memorandum's command to be in compliance with all applicable statutes did not renounce activities conducted under the 2002 memorandum which might be in violation of the VA's statutory duties. *Id.* at *3. The new mandate, the 2004 memorandum, explained the *Vietnam Veterans* court, did not sweep aside potential violations that were occurring in light of the old policies still in effect under the 2002 memorandum. *Id.*

The principles articulated in *Vietnam Veterans* apply with even greater force in the present case. The new portions of § 413, subsection (c) and (d), do not eliminate or diminish the fundamental statutory duty contained in the original statute – that Defendants provide high quality, on-site primary medical and dental care for the residents – which remains in effect. Additional statutory duties or directives do not serve to negate policies that previously existed and continue even after the enactment of any amendment. *Vietnam Veterans*, 2005 WL 901133, *3. In *Vietnam Veterans*, the new 2004 mandate did not change the VA's statutory duties and did not correct the actions under the 2002 mandate that plaintiffs alleged violated those duties.

Here, the newly enacted portions of § 413 do not alter the original and continuing statutory duties placed on the Home by Congress, and the amendments certainly cannot be read to "ratify" actions that continue to be in violation of those duties.[1]

**B.    As A Factual Matter, The Limited Services Defendants Point To In Their Renewed Motion To Dismiss Do Not Satisfy The Home's Statutory Duty Under 24 U.S.C. § 413.**

Defendants argue that because (1) there is a physician present at the Home on weekdays between the hours of 7:30 am until 4:00 pm, (2) a physician on call at other times (but not on-site), (3) the Home provides transportation on weekdays, and (4) Defendant Cox announced a policy whereby after-hours, non-emergency transportation is made available to residents, the Home is in compliance with § 413. As explained above, this argument ignores the fact that Congress did not alter the Home's statutory duty to provide "for the overall health care needs of residents in a high quality manner . . . ." Additionally, as a factual matter, even the limited factual record that is available at this point, and referenced by Defendants in their Renewed Motion to Dismiss, demonstrates that these services do not meet the original statutory duties that Congress preserved or the additional obligations Congress has created in the amendments to improve health care at the Home in the amended portions of the statute. Indeed, Defendants'

---

[1]    Defendants cite *Dial v. Coler*, 791 F.2d 78 (7th Cir. 1986) as "directly on point." In *Dial*, the statutory change encompassed precisely the violation the plaintiffs complained of (that benefits were terminated for the entire family because of the unemployed parent's failure to participate in a work incentive program) and did not leave intact additional statutory duties under which the Illinois Department of Public Aid was required to provide those benefits to the entire family. *Id.* at 79. In the instant case, Congress left intact the Home's on-going duty to provide high quality health care services that the Home continues to evade. Moreover, there were two subclasses of plaintiffs in *Dial*. The Seventh Circuit did not dismiss the claims of a second subset of *Dial* plaintiffs "because of [a] continuing factual dispute between the parties" over whether participation in the work incentive program was a pre-requisite to these plaintiffs receiving benefits and, therefore, whether violations of federal law continued. *Id.* at 80-81.

claim that these sparse measures are all that is required of them is particularly fantastic in light of the fact that in the aftermath of Hurricane Katrina, residents from the Home's Gulfport, Mississippi facility have been moved to the Washington, D.C. facility.[2]  The Home now serves 1,400 residents at the D.C. facility, instead of the approximately one thousand residents who lived there at the time this case was filed.

### 1.    Physicians and Dentists

The new § 413(c) establishes a minimum threshold for access to physicians and dentists at the Home.  This section states that in order to provide "for the health care of residents" in a high quality manner as required under § 413(b), each facility of the Home

> (1) . . . shall have a physician and a dentist –
>
> > (A) available at the facility during the daily business hours of the facility;  and
>
> > (B) available on an on-call basis at other times.
>
> (2) The physicians and dentists required by this subsection shall have the skills and experience suited to the residents of the facility served by the physicians and dentists.[3]

---

[2]    *See* Debbi Wilgoren, *D.C. Retirement Home Opens Doors to Evacuated Veterans*, Wash. Post, Sept. 2, 2005, attached here to as Exhibit A

[3]    Although there is no published legislative history that indicates the origin of this provision, it may be a response to the decision in 2004 to eliminate on-site staff physicians at the Gulfport, Mississippi campus of the Home.  *See* Tracy Dash, *Military Retirement Home Under Fire:  Federal officials will investigate complaints at the Armed Forces Retirement Home-Gulfport*, Biloxi Sun Herald, Feb 4, 2005 (reporting request by Sen. Trent Lott to Deputy Secretary of Defense Paul Wolfowitz "to probe alleged problems at the Armed Forces Retirement Home after receiving nearly 200 complaints"); Patrick Peterson, *Vets Getting Better Care, Retirement Home Says*, Biloxi Sun Herald, Feb. 26, 2004 (reporting elimination of staff physicians at Gulfport in favor of "contract doctors, available three days a week"), attached hereto as Exhibits B & C, respectively.

At a minimum, the limited presence of a physician highlighted by Defendants does not meet even this criteria. The statute requires that the physician and dentist are "available," i.e., that there is sufficient staffing so that a physician and dentist are available to the entire patient population of the Home, currently 1,400 retired and elderly residents. Section 413(c) also requires that the Home is served by health care professionals who have adequate resources, skills, and experience to serve the specific population at the Home. Defendants' overly-literal argument ignores the import of the provision that the Home be staffed with "physicians and dentists . . . [who] shall have the skills and experience suited to residents of the facility" they serve. Defendants provide no specificity about qualifications of the on call physician they claim satisfies their duties under § 413(c), and they offer no evidence about the quality of care that physician provides or whether the physician is, in fact, available to adequately serve the Home's 1,400 residents. Defendants do not contend that a physician is available on-site during regular hours on the weekends, despite the reality that people, especially elderly people with health care problems, frequently get sick on the weekend. Rather, as discussed below, before a resident can have access to a physician (through a 911 call) after hours, a duty nurse and security supervisor are tasked with determining if the resident's medical condition merits a physician's attention. Again, Defendants provide no information as to how this procedure meets their statutory duty to have "available" physicians with "the skills and experience" to meet the specific medical needs of the Home's resident population.

Defendants' contention that the limited staffing the Home provides complies with the law is simply not persuasive. A single full-time physician is not capable of handling urgent care and scheduled appointments, filling prescriptions, providing annual physical examinations, and otherwise providing high quality primary care for 1,400 retired veterans who are, on average, 78

7

years old.  The staffing described by Defendants in their Renewed Motion to Dismiss does not

provide daily, available access to doctors and dentists with the qualifications necessary to attend

the Home's resident population as required by the statute.  Even the limited factual record[4]

available in this case demonstrates:

- On November 10, 2003 the Home closed the 24 hour primary treatment room, depriving residents of on-site, after-hours access to a physician.  Currently, if a resident requires medical assistance in the middle of the night or at other times when there is only on-call service, the resident must call the security supervisor (not a licensed health care provider) who will then call the nurse on duty.  Together, the security supervisor and the duty nurse make a determination as to whether they should call 911.  If they call 911, an ambulance comes and takes the resident to the emergency room at some other facility.  (AFRH Bulletin, November 14, 2003); (Rutherford Decl. ¶ 9)); (Murray Decl. ¶ 4); (Cox Decl. ¶ 6(c));[5]

- It is undisputed that the "on call" physician is not available to actually see residents in need of medical attention after 4:00 p.m. on weekdays or any time over the weekends.  Residents who have asked to see a physician on weekends have been informed that there is no physician available and that they must wait until Monday.  (AFRH Bulletin, November 14, 2003); (Rutherford Decl. ¶ 9)); (Murray Decl. ¶ 4); (Cox Decl. ¶ 6(c));

---

[4]     Plaintiffs have not had the opportunity to conduct any discovery in this case.  Formal discovery has been stayed pending resolution of Defendants' two motions to dismiss.  Although Plaintiffs have received numerous reports from current and former health care workers at the Home expressing concern about deteriorating care, when Plaintiffs sought to conduct informal discovery by interviewing a former nurse from the Home, Defendants blocked those efforts.  *See* Letter from Department of the Army attached as Exhibit 1 to the Declaration of David H. Bamberger In Support of Plaintiffs' Request for Discovery Pursuant to Fed. R. Civ. P. 56(f) ("Bamberger Decl."), that was filed in connection with Plaintiff's Opposition to Defendants original Motion to Dismiss, or Alternatively, for Summary Judgment.

[5]     Unless otherwise stated herein, citations to exhibits and declarations refer to items submitted in connection with Defendants' original Motion to Dismiss, or Alternatively, for Summary Judgment, and the Opposition Plaintiffs filed thereto.  The 2004 Annual Report, the AFRH Bulletin, and the Morning Meeting Minutes are attached as Exhibits 2, 3, and 4, respectively, to the Bamberger Decl.  The Rutherford, Murray, Renzi, Hill, Tsukano, Fisher Declarations and the Fact Sheets are attached to Plaintiffs' Statement of Material Facts For Which There Exists An Issue To Be Litigated, filed in connection with Plaintiffs' Opposition to Defendants' original Motion to Dismiss, or Alternatively, for Summary Judgment.

- Routine dental care is either denied or delayed for unacceptable periods of time. A resident who recently needed a molar extracted was told that he could not have this procedure done on-site because the dentist was too busy and refused to provide the extraction. The resident was forced to go to a private dentist to have the molar removed and to have two implants performed, which cost him $5,400 out-of-pocket. (Renzi Decl. ¶ 4).[6]

These limited facts demonstrate that there is a live controversy over whether Defendants and the Home are providing the medical and dental services that they are required to provide under Section 413 and that they claim to provide. These few examples raise serious questions about whether appropriately skilled physicians and dentists are "available" at the Home on a "daily" basis and in a manner that ensures the Home is providing for the overall health care needs of its 1,400 residents in a high-quality manner.

### 2.    Transportation

Section 413 (d) now requires that the Home "shall provide daily scheduled transportation to nearby medical facilities used by residents of the facility," and that it "may provide, based on a determination of medical need, unscheduled transportation for a resident of the facility to any medical facility no more than 30 miles from the facility for the provision of necessary and urgent medical care for the resident." 24 U.S.C. § 413(d)(1). Defendants argue that they are compliant with this federal law because (1) the Home provides daily scheduled transportation; (2) Plaintiffs cannot show that there is no after-hours transportation policy; and (3) Mr. Cox announced a

---

[6]     These delays continue to be a problem for residents at the Home. As Plaintiffs' counsel indicated at the February 15, 2006 status hearing, Plaintiff Homer Rutherford, who was present in the courtroom during the hearing, recently suffered from a problem with his dentures. In December 2005, Mr. Rutherford tried to make a dentist appointment and was told that the first available appointment was two months away, in February 2006. In those intervening two months, Mr. Rutherford's dentures broke. He was able to have a temporary fix performed at the February appointment, but when he asked to be fitted for a new pair, he was told that the dentist was busy and that it would take up to six months to be fitted and to receive new dentures. *See* Supplemental Declaration of Homer Rutherford at ¶ 5, attached hereto as Exhibit D.

policy whereby after-hours, non-emergency transportation is made available to residents.

Defendants' argument ignores the following:

- The only medical related transportation that the Home provides is a shuttle service to Walter Reed, the VA Hospital, and Washington Hospital Center, with limited availability.[7] In may cases, the transportation is not sufficient for residents who are feeble, ill, or confused. (Rutherford Decl. ¶¶ 4, 5); (Murray Decl. ¶ 5);

- The Home does *not* provide "daily" scheduled transportation to nearby medical facilities because there is no such scheduled transportation on Saturdays or Sundays. Supp. Rutherford Decl. ¶ 3. Defendants do not contend that there is daily scheduled transportation on the weekends.

- Despite Mr. Cox's announcement on July 11, 2005 that after-hours transportation would be available, including weekends and holidays, (Fact Sheet No. 10), the Home continues to inform residents that transportation is not available. On Sunday, August 14, 2005, a resident who believed he was suffering from a recurring chronic condition asked for transportation to Walter Reed for treatment and was told no such transportation was available. He was told that he should either arrange for his own transportation or wait for the bus on Monday. (Murray Decl. ¶ 4).

- If there is an after-hours health care issue and the security supervisor and duty nurse agree to call 911 to provide medical service when there is no physician on-site, a resident will be transported to an emergency room at another facility. The Home does not pay for this transportation. Residents have incurred hundreds of dollars in expenses for this transportation. (AFRH Bulletin, November 14, 2003); (Rutherford Decl. ¶ 9); (Murray Decl. ¶ 4); (Cox Decl. ¶ 6(c)).[8]

These facts, which are largely undisputed, clearly demonstrate that there are live issues

for review with respect to the transportation services at the Home. First, it is undisputed that

there is no scheduled transportation service on the weekends. In that regard, Defendants have

---

[7]      The pending closure of Walter Reed makes the lack of available transportation even more of an immediate problem for the Home's residents.

[8]      Section 413, on its face, contemplates that residents will not have to pay for transportation required as part of their medical care. Section 413(d)(2) specifically commands that the Home "may not collect a fee from a resident for transportation provided under this subsection." This includes unscheduled transportation the Home concludes is medically necessary to an off-site "facility for the provision of necessary and urgent medical care for the resident," such as a 911 call.

failed to satisfy their statutory duty under both the statute prior to the amendment (regarding providing for the overall health care needs of the residents) *and* the requirement under the amendment that there be daily scheduled transportation services to nearby medical facilities. These facts also go to the larger question of whether the Home actually implements the 'policies' that it announces. It is one thing for the Home to issue a fact sheet stating that after-hours transportation is available. It is quite another thing to actually provide the services. In this case, the record suggests that Defendants have not actually implemented (or monitored and assured quality performance of) the policies that have been announced. At a minimum, discovery is required to test Defendants' compliance.

When read in conjunction with the rest of the provisions in the statute, the transportation provisions in Section 413(d) are an apparent attempt by Congress to ensure that all of the elderly residents who require health and medical services which are not provided at the Home will have access to those services through daily, scheduled transportation. For example, the ambulance services previously provided by the Home to residents and currently discontinued, is clearly the kind of "high-quality . . . medical care, and . . . long-term care services," contemplated by the statute. As of now, and in light of the facts discussed above, it is not clear that the Home is providing scheduled transportation that meets the needs of its 1,4000 residents and satisfies the requirements of the statute. Defendants' myopic view of their obligations ignores even the few facts known about this issue at this point and ignores the overall purpose of the statute to ensure that the Home's residents have adequate transportation to necessary medical and health services.

### 3.    Other Health Care Services

Again, ignoring the portions of the statute that Congress did not alter or remove, Defendants argue that there is no statutory requirement that any other health care services be

provided at the Home. Renewed Motion to Dismiss at 7-8.[9] Defendants' position completely ignores the command under subsection (b), more broadly entitled "Medical and dental care," that requires the Home to provide "for the overall health care needs of residents in a high quality and cost-effective manner, including primary care, medical care, and a continuum of long-term care services." Many of the services that Plaintiffs complain are not provided by the Home and that Defendants argue they have no obligation to provide should be provided under this provision of the statute. Moreover, access to those services are often hindered by the Home's ineffective provision of services that are specifically discussed in the statute, including transportation, on-site physicians and dentists, and the availability of after-hours care.

The factual record in this case demonstrates glaring inadequacies in the quality of care at the Home with respect to these kinds of services:

- The Home has eliminated its 24 hour a day, on-site pharmacy in which residents could obtain prescription medications on the same day that they were prescribed. In 2003, the on-site pharmacy was closed and replaced with an outside service provider. Most prescriptions are filled at Walter Reed Army Medical Center, which is slated to be closed. Unless the resident can obtain transportation and pick the prescription up in person, it typically takes three to five days, and sometimes longer, to receive his or her medication. (Supp. Rutherford Decl. ¶ 4.) Sometimes, a prescription must be filled at a local pharmacy to which the Home does not provide any transportation. (Rutherford Decl. ¶¶ 4, 5); (2004 Annual Report p. 37);

- In response to the elimination of the 24 hour on-site pharmacy, residents, in the past, were forced to form a volunteer carpool system to pick up prescriptions for

---

[9]    Defendants argue that § 413(c)(3), which requires the Chief Operating Officer and Medical Director to jointly establish uniform standards "for access to health care services during and after the daily business hours of the facility," confers on the Chief Operating Officer the discretion to determine what care should be provided at the Home. This provision is a subsection of the amendment regarding the "[a]vailability of physicians and dentists," and does not alter the statute's command that that Home "shall provide for the overall health care needs of residents in a high quality . . . manner . . . ." § 413(b). Defendants' argument again fails to recognize that duties created in one subsection of the statute do not eviscerate ongoing obligations in another portion of the statute.

residents who require medications immediately.  If a resident requires a prescription to be filled immediately, a nurse from the Home's community health care center contacts a member of the carpool who will pick up the patient, or the patient's identification card, and drive to Walter Reed (in his personal car and at his personal expense) to have the prescription filled.  The nurses routinely call on this service.  (Rutherford Decl. ¶¶ 6, 7);

- Despite the fact sheet issued by Mr. Cox on May 31, 2005, which indicates "independent residents can receive their medication the same day," the Home does not provide such a service. (Rutherford Decl. ¶¶ 4-6); (Murray Decl. ¶4); (Supp. Rutherford Decl. ¶ 4);

- In July, 2004, a physician at the Home reported in a morning meeting that "there is no provision to issue medications to outpatients on the weekend."  This situation has not been corrected.  On July 11, 2005 – a year later, and after this action was filed -- the Home further announced that "effective immediately, AFRH residents will now have medications available to them after-hours" and that the medications will be available when the clinics are closed.  In fact, the Home only maintains a few over-the-counter medications, which medical staff has described to residents as "stuff for headaches."[10]  (Morning Meeting Minutes, July 8, 2004); (Murray Decl. ¶ 4); (Rutherford Decl. ¶ 8); (Fact Sheet No. 10).

- In 2003, the Home eliminated the provision of x-ray services on site for the residents.  Defendants admit that the Home did not provide any x-ray services at the Home for two years.  The May 31, 2005 "fact sheet" states that "since May 1, 2005, x-ray services are provided by a vendor who comes to the resident's bedside or room."  In practice, the Home still refuses to provide x-ray services to residents and instructs them to go to Walter Reed to get x-rays.  (Fact Sheet No. 8);  (Cox Decl. ¶ 6(f)); (Hill Decl. ¶ 4).

- Physicians at Walter Reed, who have treated residents for various specialized conditions, have commented about how their overall condition indicated that they were not receiving adequate care.  Medical staff at the Home have resigned due to the changes at the Home.  Long term residents, as well as non-resident spouses who visit on a regular basis, have recognized a decline in the number of staff, the services provided, and the quality of care.    (Tsukano Decl. ¶¶ 4, 11); (Murray Decl. ¶ 6) (Fisher Decl. ¶ 7).

---

[10]     Once again, the evidence reveals a dramatic difference between the announced "policy" – that medicines are available after hours – and the actual practice at the Home.

These types of basic services easily qualify as overall medical and dental care that the Home must provide for in a high quality manner. 24 U.S.C. § 413(b). Moreover, the facts cited above demonstrate how the Home's systemic failure to provide adequate doctors, dentists, and transportation immediately impacts on the residents' ability to obtain prescriptions, x-rays, and receive overall high quality health care. For example, if a resident cannot get access to a physician, that physician cannot prescribe the appropriate medication. The resident also no longer has an on-site pharmacist to turn to when the physician is not available. If a resident does get a prescription, he still has hurdles to overcome in order to have that prescription filled. If the medication that he needs is necessary to help an urgent or chronic medical condition, something not uncommon in the elderly patient pool at the Home, these hurdles can be life threatening. The Home's failure to provide these services and the residents' inability to obtain them because of other failures, such as the failure to provide transportation, establishes that this case is not moot.

In their Complaint, Plaintiffs seek injunctive and other relief as this Court may deem appropriate to ensure that Defendants meet their statutory obligations to "provide for the overall health care needs of the residents in a high quality manner." Complaint at 13. Even with the additional provisions enacted by Congress to improve the state of health care services provided at the Home, the need for injunctive relief still clearly and urgently exists. Plaintiffs seek this Court's assistance in ensuring that the Home acts in accordance with the legal duties Congress has imposed on them. The amendments to § 413 do not alter the legal duties that existed at the time this lawsuit was filed and that Congress left intact. As there is still a live controversy as to what services the Home is actually providing and whether those services are sufficient under the law, Plaintiffs' need for judicial relief persists.

**C.    Plaintiffs Are Entitled To Discovery.**

The Renewed Motion to Dismiss should be denied because Defendants have failed to meet their considerable burden for dismissal at this stage. The factual record currently available indicates that Defendants have failed to satisfy their statutory duty and that there are live issues to be addressed in this case. Moreover, the majority of discovery relevant to this case is in the hands of the Defendants and is not currently available to Plaintiffs.[11] Thus, at a minimum, Plaintiffs should be afforded an opportunity to conduct discovery. The Court of Appeals has noted that on a motion under Rule 12(b)(1)

> the court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction to hear the action . . . [T]he district court must give the plaintiff an opportunity for discovery and for a hearing that is appropriate to the nature of the motion to dismiss . . . Insofar as the defendant's motion to dismiss raises factual issues, the plaintiff should have an opportunity to develop and argue the facts in a manner that is adequate in the context of the disputed issues and evidence. Thus, although a Rule 12(b)(1) motion cannot be converted into a motion for summary judgment as a Rule 12(b)(6) motion can . . . a district court can assure that appropriate extra-pleading materials are consulted in determining the threshold jurisdictional issue.

*Wilderness Soc. v. Griles*, 824 F.2d 4, 16 n.10 (D.C. Cir. 1987) (internal citations and quotations omitted). *See also Sizora v. Nat'l Inst. Of Standards and Tech.*, 282 F.3d 1320, 1226-28 (10th Cir. 2002) (reversing dismissal under Rule 12(b)(1) because district court failed to order discovery on jurisdictional question); *Coastal States Gas Corp. v. Dept. of Energy*, 84 F.R.D. 278, 282 (D. Del. 1979) ("[D]iscovery should precede consideration of dispositive motions when the facts sought are relevant to consideration of the particular motion at hand.").

---

[11]     *See* n.4, *supra*.

If discovery is allowed to proceed, there is every reason to believe that there is a substantial body of evidence that will shed light on the quality of health care provided to residents at the Home and systemic failures in that care that have impacted the residents at large. Plaintiffs have received unsolicited reports from health care professionals that residents are not receiving adequate medical care and are suffering as a result. Examples of the specific impacts of the overall health care failures at the Home reported to Plaintiffs' counsel include the loss of both legs by one resident who had pressure ulcers on both heels wrapped in unsterile dressings because the Home did not have adequate supplies; the death of one resident with severe signs of dehydration and malnutrition; and proof of severe malnutrition and dehydration and a broken arm that remained untreated for months in another resident admitted to Walter Reed. Physicians at Walter Reed have reported their concerns about overall patient care to the Home's ombudsman and long time medical staff have resigned because of the kinds of changes that are being implemented throughout the Home and that impact all areas of patient and resident life. Discovery in this case will provide detail about the Home's overall health care system, the failures of that system, and whether, on an overall basis, Defendants are satisfying their statutory duties under Section 413.

## CONCLUSION

The amendments to 24 U.S.C. § 413 do not render this case moot. Defendants' argument that the Home need only provide a single doctor and a single dentist on-site for eight and a half hours, five days a week, a nurse and a security supervisor who decide to call 911 if they feel a resident's medical needs are urgent at all other times, and an unspecified schedule of transportation to a few off-site facilities on weekdays only, for a resident population that has recently grown to 1,400 individuals, ignores the import of the statute, the statutory obligations

placed on the Home by Congress, and simply defies logic. Dismissal "on grounds of mootness would be justified only if it were absolutely clear that the litigant no longer had any need of the judicial protection that it sought." *Adarand Constr., Inc. v. Slater*, 528 U.S. 216, 224 (2000). The violations identified in the Complaint continue and are on-going, and Plaintiffs require relief from this Court. Therefore, Defendants' Renewed Motion to Dismiss should be denied.

Respectfully submitted,

 

_____/s/_____

David H. Bamberger (D.C. Bar No. 362285)
J. David Folds (D.C. Bar No. 449791)
Dimitra D. Joannou (D.C. Bar No. 488973)
Mila Z. Zain (D.C. Bar No. 490282)
DLA PIPER RUDNICK GRAY CARY U.S. LLP
1200 Nineteenth Street, N.W.
Washington, D.C. 20036-2412
Phone: (202) 861-3900
Fax: (202) 223-2085

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of March, 2006, I caused a copy of Plaintiffs' Opposition to Defendants' Renewed Motion to Dismiss to be mailed, postage prepaid, to:

> Kevin K. Robitaille
> Special Assistant U.S. Attorney
> 555 Fourth Street, N.W.
> Washington, D.C. 20530

Respectfully submitted,

_____/s/_____
David H. Bamberger (D.C. Bar No. 362285)
J. David Folds (D.C. Bar No. 449791)
Dimitra D. Joannou (D.C. Bar No. 488973)
Mila Z. Zain (D.C. Bar No. 490282)
DLA PIPER RUDNICK GRAY CARY U.S. LLP
1200 Nineteenth Street, N.W.
Washington, D.C. 20036-2412
Phone: (202) 861-3900
Fax: (202) 223-2085

Attorneys for Plaintiffs

# The Washington Post

## D.C. Retirement Home Opens Doors to Evacuated Veterans
[FINAL Edition]

The Washington Post - Washington, D.C.
Author:              Debbi Wilgoren
Date:                Sep 2, 2005
Start Page:          B.01
Section:             METRO
Document Types:      News
Text Word Count:     583

**Full Text** (583 words)

*Copyright The Washington Post Company Sep 2, 2005*

The cheering started as soon as the buses rumbled up the driveway of the District's Armed Forces Retirement Home. Military officers and enlistees mixed with civilians in a two-sided receiving line, waving small American flags and clapping for the elderly veterans who had survived World War II, Korea and, now, Katrina.

"Welcome to D.C.! Welcome to your new home," said Rochelle Jones, a staffer for the U.S. Army Community and Family Support Center in Alexandria. Stepping forward, she enveloped Jim Holder in a hug.

"Oh, honey, I love you," said Holder, who wore a light shirt, khaki shorts, white socks and black loafers, and clutched a plastic shopping bag stuffed with a few belongings.

Jones hugged harder. "I love you, too."

Holder was among 415 veterans evacuated from the Armed Forces Retirement Home in Gulfport, Miss., after Hurricane Katrina flooded the ground floor of their quarters Monday, leaving them without electricity or running water.

About 250 evacuees arrived just before noon at the leafy, landscaped campus of their sister home in Northwest Washington, exhausted from a trip that stretched across two days and several states.

The most frail were flown to Washington separately, while two hardy retirees drove in a private vehicle. Dozens more were expected to trickle in soon.

With their Mississippi beachfront facility uninhabitable, and much of the neighborhood around it destroyed, the retirees will stay at the D.C. home for at least several months, said Timothy C. Cox, chief operating officer of both entities.

A spokeswoman for the home said the facility has about 1,000 permanent residents but can accommodate up to 1,700. Military veterans and retirees who have reservations to enter will not lose their places, officials said.

News that the retirees in Gulfport needed a haven prompted a flurry of activity at the historic D.C. campus, built on 276 hilly acres between North Capitol Street and the Brightwood neighborhood. Hundreds of staffers and volunteers cleaned 400 empty rooms in a dormitory and an unused residential building; hauled in beds, nightstands and clothes lockers; hung towels; tucked in sheets and blankets; and prepared bags of donated toiletries and snacks.

Melodie R. Menke, director of volunteer services at the home, said a public appeal for assistance prompted thousands of responses, including one by a mother and son from Michigan on vacation in Washington.

"They jammed the phone lines, they jammed the e-mail; we had just an outpouring of people," Menke said. " 'I want to help our vets. They helped us.' Almost everybody used that line."

The Gulfport facility opened in Philadelphia in 1834 for Navy retirees and relocated to Mississippi in 1976. It was merged administratively with the D.C. facility -- known at that time as the Soldiers' and Airmen's Home -- in 1991. Both homes were open to veterans who had served at least 20 years, served in a war theater or retired with a service-related injury.

Cox said yesterday it is too soon to know whether the Gulfport home will be rebuilt.

**Exhibit A**

The evacuees clambered down from the buses looking dazed, some using canes, walkers or wheelchairs, others toting pillows or oxygen tanks. They'd been permitted to pack a single suitcase before leaving, and officials said they did not know how much of the remaining belongings could be salvaged.

One man, sporting several days' growth of white whiskers, paused before a smiling young woman in Air Force fatigues.

"Terrible experience. Terrible," he said, shaking his head.

"It's okay," the young woman gently told him. "You're home now."

Reproduced with permission of the copyright owner. Further reproduction or distribution is prohibited without permission.



2/4/05 SHRLD A1                                                            Page 1


2/4/05 Sun Herald (Biloxi, MS) A1
2005 WLNR 22876740

Sun Herald (Biloxi, MS)
Copyright 2005 The Sun Herald

**February 4, 2005**


Complaints spark probe
MILITARY RETIREMENT HOME UNDER FIRE MILITARY Federal officials will investigate
complaints at the **Armed Forces Retirement Home**-Gulfport.

TRACY DASH, THE SUN HERALD

Sen. Trent Lott has asked Deputy Secretary of Defense Paul Wolfowitz to probe
alleged problems at the **Armed Forces Retirement Home** after receiving nearly 200
complaints.

Lee Youngblood, Lott's spokesman in Jackson, confirmed Thursday that Lott spoke to
Wolfowitz on Wednesday and briefed him about the complaints. The senator followed
up with a letter to Wolfowitz, asking him to check into the situation and report
his findings within 30 days.

"This is a major concern," Youngblood said.

Youngblood didn't know the nature of the complaints or who made them.

The retirement home made headlines a week earlier when the deputy director filed a
complaint against the director, saying she was wrongfully placed on administrative
leave.

Air Force Lt. Col. Wendy Van Dyke said in her complaint that Navy Capt. Jerald L.
Ulmer Sr. put her on leave while she was being investigated for overruling a
decision by health care administrator **Kenneth Brown** and Tommie Wyatt, a nursing
supervisor. Brown and Wyatt denied leave to a nurse scheduled for surgery,
according to the complaint.

Brown died Wednesday afternoon. A statement released by the **Armed Forces Retirement
Home** in Washington said the staff and residents "mourn the passing of Mr. **Kenneth
Brown**... Our thoughts and prayers are with his family and friends."

The press release did not give the cause of death.

Residents and staff have expressed concerns about how Ulmer and Tim Cox, who
oversees the Gulfport and Washington homes, operate the Gulfport home.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Unnamed staff members sent a letter last month to Lott, numerous other federal officials and Christian leaders, detailing alleged problems. They said staffing levels were cut and asserted they are "so far below state and federal guidelines that it is scary."

The letter is signed, "Scared employees of the **Armed Forces Retirement Home** Gulfport, Miss."

Residents spoke out last week and said they want Van Dyke back on the job.

Ulmer and Cox, who is in Gulfport this week, did not return phone calls for comment.

The **Armed Forces Retirement Home**-Gulfport is now the subject of a Defense Department investigation.

---- INDEX REFERENCES ----

NEWS SUBJECT:  (Legal (1LE33); Judicial (1JU36); Police (1PO98))

INDUSTRY:  (Longterm Care (1LO33); Healthcare (1HE06); Healthcare Services (1HE13); Healthcare Service Providers (1HE78))

REGION:  (USA (1US73); Americas (1AM92); North America (1NO39); Mississippi (1MI74))

Language:  EN

OTHER INDEXING:  (AIR FORCE; **ARMED FORCES RETIREMENT HOME; ARMED FORCES RETIREMENT HOME** GULFPORT; DEFENSE DEPARTMENT; GULFPORT)  (Brown; Cox; Dyke; Jerald L. Ulmer Sr.; Kenneth Brown; Lee Youngblood; Lott; Miss; Paul Wolfowitz; Tim Cox; Tommie Wyatt; Trent Lott; Ulmer; Wendy Van Dyke; Wolfowitz; Wyatt; Youngblood)

Word Count: 421
2/4/05 SHRLD A1

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2/4/05 SHRLD A1                                                      Page 3

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

NewsRoom

2/26/04 SHRLD A2

Page 1

2/26/04 Sun Herald (Biloxi, MS) A2
2004 WLNR 19145212

Sun Herald (Biloxi, MS)
Copyright 2004 The Sun Herald

February 26, 2004

Section: A

Vets getting better care, retirement home says

PATRICK PETERSON
Biloxi Sun Herald

GULFPORT Revenue sources

$40 million (60 percent) comes from fines levied on military infractions by active duty members.

$13 million (20 percent) comes from residents' fees.

$7 million (11 percent) comes from a 50 cent per month contribution from military members.

$5.3 million (8 percent) comes from interest on the home's trust fund.

More than $1 million comes from gifts and contributions.

While residents fear cuts in services at the Armed Forces Retirement Home, contact has increased between the home's staff and members despite budget cuts, the chief operating officer said Wednesday.

"We actually have more hours of care than we did before," said Timothy Cox, an attorney with 19 years' experience in managing retirement homes.

Having eliminated staff **physicians**, the Gulfport home now relies on contract doctors, available three days a week. However, nurses - available 24 hours a day - provide routine care. During emergencies, ambulances transport residents to local hospitals, the same procedure followed by the staff doctors.

"The continuity of care has increased," Cox said.

The veterans now use TriCare veterans medical insurance to pay for doctor visits, which has helped the home reduce costs.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"We needed to get maximum benefit from the money we were spending," Cox said.

Known as the Naval Retirement Home before 1991, the home in Gulfport then merged, by order of Congress, with its Washington, D.C., counterpart for Army and Air Force veterans and came under the management of a board of directors. Residents stayed free in the home until 1991, when they were required to contribute part of their pensions.

In 2002, Congress eliminated the management board and created the chief operating officer position. An executive headhunter firm recruited Cox.

Cox says the home's finances are improving. Between 1995 and 2002, the homes' trust fund fell from $156 million to $102 million. Now, Cox expects budget surpluses by 2005. Major savings will come from an $8.8 million yearly reduction in salaries, which make up about 75 percent of expenses.

Cox has reduced duplicated services and cut personnel by 11 percent at both homes. No further cuts are planned for Gulfport, while 60 to 90 positions will be cut in Washington, which now has about 500 workers.

Residents pay an average of $642 per month, about half the actual cost of care.

Expansion

A $19 million expansion, scheduled to begin this fall, will add 64 larger rooms to the AFRH. The larger rooms will create comfortable quarters for residents who use wheelchairs.

Residents spend an average of eight years at the AFRH and usually move in after the death of a spouse. Women make up 11 percent of the residents.

Patrick Peterson can be reached at 896-2343 or at pfpeterson@sunherald.com

---- INDEX REFERENCES ----

INDUSTRY:  (Longterm Care (1LO33); Healthcare (1HE06); Longterm Care Practices & Management (1LO86); Healthcare Services (1HE13); Healthcare Service Providers (1HE78))

REGION:  (District Of Columbia (1DI60); USA (1US73); Americas (1AM92); North America (1NO39); Mississippi (1MI74))

Language:  EN

OTHER INDEXING:  (AFRH; AIR FORCE; ARMY; CONGRESS; GULFPORT; NAVAL RETIREMENT HOME; TRICARE)  (Cox; Patrick Peterson; Timothy Cox; Vets; Women)

KEYWORDS:  (local)

Word Count: 548
2/26/04 SHRLD A2
END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MARTIN CODY, et al.** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| v. | ) **Civil Action No. 05-1041 (RJL)** |
| | ) |
| **DONALD RUMSFELD,** | ) |
| **Secretary of Defense, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

## SUPPLEMENTAL DECLARATION OF HOMER RUTHERFORD

1.      My name is Homer Rutherford. I am over 18 years of age and have personal knowledge of the facts set forth herein. I give this Affidavit to supplement the Affidavit that I submitted previously in opposition to Defendants' initial Motion to Dismiss or, In The Alternative, for Summary Judgment.

2.      I retired from the United States Air Force in 1969 as a Senior Master Sergeant with 23 years of active-duty service. I have been a resident of the Armed Forces Retirement Home in Washington, D.C. (the "Home") since June, 2002. I am a member of the Home's Resident Advisory Council.

3.      I am familiar with the practices at the Home regarding transportation services for residents. While the Home does provide a shuttle to Walter Reed Army Medical Center, the Veterans' Administration Hospital, and Washington Hospital Center during the daytime from Monday to Friday, the Home does not provide any scheduled transportation services to these facilities on the weekends.

**Exhibit D**

4.    I am also familiar with the practices at the Home with respect to filling prescriptions for residents.  This familiarity derives, in part, from several recent discussions I have had with the assistant director at the Home regarding problems encountered by residents in having prescriptions filled under the existing process in which the prescriptions are filled at Walter Reed and then made available to the resident at the Home.  The existing practice at the Home remains the same.  The Home does not provide a same day prescription service for residents. Typically, the process of having a prescription filled takes from three to five days, and in some cases longer.

5.    In the last few months, I have had a need for dental services at the Home.  In December, 2005, I asked for an appointment in order to get my dentures relined.  I was informed that the next available appointment was February 8, 2006.  In early January, 2006, my upper denture plate broke. *A temporary repair was made until my 2 feb appointment*  At my appointment on February 8, 2006, I asked for new dentures.  The dentist informed me that it could not be done because they were too busy.  I was instructed to come back in May, at which time they would fit me for new dentures and order them, after which it would take approximately three months for them to arrive.

I hereby declare and affirm, subject to the penalties of perjury, that the foregoing statement is true and correct.

Dated: February _28_, 2006

_Homer C. Rutherford_
Homer Rutherford

2