## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MARTIN CODY et al.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 05-1041 (RJL)** |
| | ) | |
| **ROBERT M. GATES** | ) | |
| **Secretary of Defense et. al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

### <u>DEFENDANTS' MOTION TO FOR SUMMARY JUDGMENT</u>

Defendants hereby move for summary judgment pursuant to Rule 56 of the Federal Rules

of Civil Procedure because there is no genuine issue as to any material fact and Defendants are

entitled to judgment as a matter of law.  In support of this motion, Defendants respectfully

submit the attached memorandum of points and authorities and a proposed order.

Respectfully submitted,

/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney
/s/_____
BRIAN C. BALDRATE
Special Assistant United States Attorney
Civil Division
555 4th St., N.W.
Washington, D.C.  20530
(202) 353-9895

Of Counsel:
Major Patrick Gary
U.S. Army Legal Services Agency
Arlington, Virginia  22203-1837

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MARTIN CODY, et al, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Case No. 05-1041 (RJL) |
| | ) | |
| ROBERT GATES, | ) | |
| Secretary of Defense, et al, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT.**

## I. INTRODUCTION

Plaintiffs, residents of the Armed Forces Retirement Home ("the Home"), brought suit pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1361 alleging that Defendants, the Secretary of Defense and Timothy Cox, the Chief Operating Officer ("COO") of the Home, failed to provide for the overall health care needs of the residents of the Home in a high quality and cost-effective manner as mandated by 24 U.S.C. § 413 ("the Statute"). Plaintiffs further allege that elimination and/or degradation of various health care services previously provided to the Home's residents also violate the Statute. (Amend. Compl. ¶¶ 12, 18.) 24 U.S.C. § 413 provides that, "[t]he Retirement Home shall provide for the overall health care needs of residents in a high quality and cost-effective manner, including on site primary care, medical care, and a continuum of long-term care services." 24 U.S.C. § 413(b).

Plaintiffs claim that changes instituted in the Home's health care system made to improve the overall quality of care given to residents and reduce costs, violate the Statute. (Amend.

Compl., at 1-2.)  In particular, Plaintiffs ask this Court, pursuant to its authority under 5 U.S.C. §

706, to order Defendants to provide for the overall health care needs of residents in a high quality

manner by:

> (i) Making qualified physicians available to provide primary health care to
> residents during the business hours of the Home, and available to see residents as
> needed at times other than the daily business hours of the Home; (ii) Making
> qualified dentists available to provide dental care to residents during the business
> hours of the Home, and available to see residents as needed at times other than the
> daily business hours of the facility; (iii)  Maintaining the ability to provide
> promptly the medications required for the treatment of residents, including
> providing new prescriptions the same day that they are prescribed; (iv)
> Maintaining the ability to provide on-site x-ray services, electrocardiogram
> services, laboratory work, and such other services as are required to provide for
> the primary health care needs of the residents; (v) Establishing uniform standards
> appropriate to the medical needs of the residents for access to health care services
> at the Home; (vi) Providing reliable scheduled transportation to other medical
> facilities every day, including weekends and holidays, at no charge to the
> residents.; and, (vii) Providing annual examinations for each resident to assess
> their overall physical and mental condition. . .

(Amend. Compl., at 11-12.)

Plaintiffs originally filed a complaint on May 24, 2005.  (R. # 1).  Defendants filed a

motion to dismiss, or alternatively, for summary judgment on August 18, 2005.  (R. # 6, Memo

Op.).  In their motion, Defendants argued that the Statute provided no judicially manageable

standard by which a court could evaluate the agency's action.  In the alternative, Defendants

moved for summary judgment.

While the motion was pending, President George W. Bush signed into law the National

Defense Authorization Act for Fiscal Year 2006 ("NDAA").  Pub. L. No. 109-163, § 909, 119

Stat. 3136, (2006).  Section 909 of P.L. 109-163 is entitled, "Improvements in Health Care

Services for Residents of Armed Forces Retirement Home" and specifically amended 24 U.S.C.

§ 413 by adding subsections (c) and (d) which state:

(c) Availability of Physicians and Dentists.–(1) In providing for the health care needs of residents at a facility of the Retirement Home under subsection (b), the Retirement Home shall have a physician and a dentist--

(A) available at the facility during the daily business hours of the facility; and

(B) available on an on-call basis at other times.

(2)The physicians and dentists required by this subsection shall have the skills and experience suited to residents of the facility served by the physicians and dentists.

(3) To ensure the availability of health care services for residents of a facility of the Retirement Home, the Chief Operating Officer, in consultation with the Medical Director, shall establish uniform standards, appropriate to the medical needs of the residents, for access to health care services during and after the daily business hours of the facility.

(d) Transportation to Medical Care Outside Retirement Home Facilities.–(1) With respect to each facility of the Retirement Home, the Retirement Home shall provide daily scheduled transportation to nearby medical facilities used by residents of the facility.  The Retirement Home may provide, based on a determination of medical need, unscheduled transportation for a resident of the facility to any medical facility located not more than 30 miles from the facility for the provision of necessary and urgent medical care for the resident.

(2) The Retirement Home may not collect a fee from a resident for transportation provided under this subsection.

NDAA, Pub. L. No. 109-163,   909, 119 Stat. 3136 (2006); 24 U.S.C. § 413 (c) and (d)

(2006)(the "Amended Statute").[1]

This Court denied Defendants' motion to dismiss, or in the alternative, motion for

summary judgment, by minute order on January 25, 2006.  In light of the Amended Statute,

Defendants filed a renewed motion to dismiss for lack of subject matter jurisdiction on February

1, 2006, arguing that the amendments to the Statute rendered the complaint moot.  (R. # 21).

---

[1] The Statute was recently amended again on January 28, 2008, to add a sentence to 24 U.S.C. § 413 (b) which states, "The services provided residents of the Retirement Home shall include appropriate nonacute medical and dental services, pharmaceutical services, and transportation of residents, which shall be provided at no cost to residents."  (AR 0024.)  In addition, the amended statute includes a new section, 24 U.S.C. § 413a, which deals with healthcare oversight of the Home.  (AR 0025-0026.)

The District Court agreed and found that Plaintiffs' claims presented no remaining live controversy as the recent amendment to 24 U.S.C. § 413 had rendered the case moot.  (R. # 29). Plaintiffs appealed and the D.C. Circuit Court of Appeals reversed the case and remanded to this Court on March 12, 2008, for further proceedings consistent with its opinion. (R.#35, Mandate of USCA.)  That same day, Plaintiffs purported to file an "amended complaint."[2]  (R. #36).

## **Factual Background**

The Home consists of the Armed Forces Retirement Home – Washington (AFRH-W), located in Washington, D.C., and the Armed Forces Retirement Home – Gulfport (AFRH-G), located in Gulfport, Mississippi.[3]  Both homes are continuing care retirement communities that provide residences and related services for certain retired and former members of the Armed Forces.  (AR 144.)  The Home is funded by Congressional authorization for funds to be expended from a Trust Fund held by the United States for operation of the Home.  The Trust Fund receives its revenues from money collected from monthly active duty payroll deductions from enlisted soldiers (currently fifty cents per month), resident fees, fines and forfeitures from the Armed Forces, gifts, bequeaths, and interest earned on the balance of the Home's Trust Fund. (AR 153.)  Each year Congress provides the Home with a lump sum appropriation from the Trust Fund.  (AR 153.)  From 1995 until 2003 operating expenses of the Home had exceeded the revenues going into the Trust Fund held for operation of the Home.  The balance of the Trust Fund had declined from $171.2 million in 1995 (AR 776) to $94 million dollars in 2002.  (AR 170.)

---

[2] Despite a continued dispute as to whether Plaintiffs properly amended their complaint, (See R. #40, Opp. to Default at 7-8),  Defendants have treated Plaintiffs' "amended complaint" as the operative Complaint going forward.
[3] Plaintiffs are only residents of the AFRH-W facility and that is the only location relevant to this suit.

Thus, in order to survive, it was necessary for the Home to transform the way it operated, i.e., to become financially self-sustaining. Since taking over as the COO in September 2002, Mr. Cox implemented numerous changes at the Home, including several changes regarding health care services. The result has been a more cost effective service delivery model to provide residents high quality medical and dental care. As an example, the Home has consolidated its Dentistry, Optometry, Community Health, Ambulatory Care and Medical Records functions and services. (AR 66-67.) By consolidating these operations the Home has centralized care and made services far more convenient and available for the residents.

A brief overview of the residents' healthcare is as follows: The residents of the Home fall into one of three categories for the purposes of managing their health care: Independent Living, Long Term Care, or Assisted Living. (AR 679-81.) The great majority of residents are in Independent Living. As stated above, the Community Health Clinic, Dental Clinic, and Optometry service have been consolidated in one centralized location. In addition to being centralized, these services are collocated with the Independent Living residence to provide more convenient and accessible health care services. (AR 66-67.) Independent Living residents are just that - they live independently and are largely responsible for their own well-being. Long Term Care and Assisted Living residents require more specialized and frequent care. The remaining named Plaintiffs are all Independent Living residents and all of Plaintiffs' complaints and relief sought pertain to services available to Independent Living residents. As a result, this motion addresses the decisions and actions by Defendants regarding the healthcare services that are available to the Independent Living residents. The types of health care services provided at the Home are further described below.

Medical Care:  The Home has four physicians available to see patients, the same number of physicians that have always been available to see patients.  (AR 44.)  All residents are assigned to one of these providers when entering the home.  Appointments are set-up with their providers through a centralized in-house appointment system.  The Medical Director on staff collaborates with both internal and external providers when needed.  Residents have access to physicians at the Walter Reed Army Medical Center (WRAMC), the Veterans Administration Medical Center (VAMC) and local hospitals.  Residents have freedom of choice in choosing physicians in the private sector.  Under previous policy, residents used to see physician assistants, however, the Home eliminated the physician assistant positions and residents are now seen only by qualified physicians.  (AR 33; 43-44.)  Annual physical examinations are also available to residents of Independent Living.  (AR 45.)

Prior to 2003, the Home's Washington treatment room was staffed by a physician 24 hours a day.  Twenty-four hour coverage is still provided.  Currently, a physician is assigned to the Community Health Clinic, Monday through Friday, from 7:30 a.m. until 12:00 noon to see all walk-in residents.  There are scheduled appointments from 1:00 p.m. to 4:00 p.m.  After hours the Home has a Registered Nurse in the Community Health Clinic from 4:00 p.m. until 12 midnight to assess and assist residents in the independent setting.  After midnight a Registered Nurse is physically available to see residents.   The Registered Nurse assesses the resident's medical status, treats the resident, or calls 911.  In case of an emergency, i.e., shortness of breath or chest pain, residents are encouraged to call 911 and not wait for the nurse.  A physician is on-call between the hours of 4:00 p.m. until 7:30 a.m. seven days a week for consultation with the on-duty nurse.  (AR 43-44; AR 66-67.) This change resulted in a major reduction in costs with minimal impact on residents.  The Community Health Clinic is conveniently located on the

6

ground floor of the Scott Building, an Independent Living dormitory housing most residents. (AR 112, 118.)

Dental Care:  Residents in Independent Living receive check-ups when requested by appointment (dental care is provided on a routine basis for Assisted and Long Term Care residents).  An emergency walk-in clinic is held every morning.  To accommodate the resident's needs, the dental clinic was relocated with independent living residents on the ground floor of the Scott Building to provide enhanced and more accessible dental services.  The three-chair dental clinic, which opened in March 2005, is state-of-the-art and allows dental x-rays to be taken and read on site.  Other services include comprehensive oral examinations, emergency care such as pain management, basic tooth cleaning, fillings, root canal, single crowns, and simple extractions.  (AR 113.)  Residents in Long-Term Care receive annual dental check-ups.  A mobile dental clinic comes on campus five days per week to provide dental services for Assisted Living and Long Term Care residents.  (AR 113.)  More extensive dental needs are handled by referrals.  (AR 34.)

After Hours Non-Emergency Transportation:  The Home's residents have after hours non-emergency transportation available to them from 8:00 pm until 8:00 am.  The service is available from Monday through Friday, weekends and holidays.  The residents may obtain non-emergency transportation after hours by requesting it through the Home's Security Office.  The security office notifies the supervisor on duty, who comes to the resident's room to evaluate the resident's situation and determine if the resident can be transported via the Home's regular transportation or if "911" needs to be called.  Residents who are unable to get transportation back from the acute care hospital notify the Home's Security Office, which coordinates for transportation via a van provided by a contract service.  After hours non-emergency

transportation covers transportation to WRAMC, VAMC, and the Washington Hospital Center. There is no cost to the resident for this transportation. The Home does not provide emergency transportation. (AR 117-118.) Off campus transportation is provided hourly, Monday through Friday, 6:50 a.m. to 6:00 p.m. (AR 117.)

    <u>Pharmaceutical Services</u>: Prior to 2003, the Home operated a 24 hour a day medication room. Referred to as a "pharmacy," the medication room was merely used to dispense medications from prescriptions filled at WRAMC or the VAMC. (AR 688-689; AR 47.) The Home continues to provide Independent Living residents with medications via a medication room, which allows residents to pick-up the prescriptions filled at WRAMC if they chose not to pick them up from WRAMC themselves. The medication room is located in the Scott Building. (AR 114.) Independent Living residents can receive medications within 24-48 hours; however, refills take three days, which is consistent with the service delivery model used throughout the military. (AR 114.) Normally, when a resident is ill and requires prescription medication, the physician will provide the proper dosage. (AR 114.) The resident's prescription will be electronically sent to WRAMC to be filled. (AR 114.) Long Term Care residents receive their medication through a contract pharmacy called Neighborcare. Medications come in unit-dose packaging, which provide a safe and accurate administration system. Residents' supplemental insurance is billed for the medications monthly. Medication costs for those residents who do not have supplemental insurance are paid by the Home.

    Residents of the Home have medications available to them after hours in the Community Health Clinic. The Community Health Nurse will call the physician on-call should residents become ill after hours, on weekends, or holidays. Medications are available during the hours of

4:00 pm and 8:00 am when the Clinic is closed.  There is no cost to the resident for these medications.  (AR 114.)

X-Rays and EKGs:  The Home discontinued the use of in-house x-ray equipment in 2003.  The equipment was old and unsafe.  The outdated equipment posed a potential health hazard to residents and staff.  (AR 48.)  The Home contracts with a private vendor for on-site x-ray and EKG services.  Services are provided right in the resident's room.  EKG services are also available in the Community Health Clinic when needed and are provided by private vendor.  (AR 114.)

In 2004, counsel for Plaintiffs wrote to Secretary Rumsfeld complaining that actions taken by the Home violated 24 U.S.C. § 413.  (AR 29.)  The letter, dated February 19, 2004, complained of a serious decline and elimination of "on site" medical and dental services and specifically mentioned the closing of the treatment room, the availability of fewer buses, and the elimination of emergency dental services.  (AR 29-30.)  Mr. Cox, the COO, responded to Plaintiffs' counsel on April 27, 2004.  (AR 33-35.)  Mr. Cox explained in his letter that the treatment room was a quasi-clinic, with no ability to perform x-rays or lab work, and was slated for closure.  (AR 33.)  Mr. Cox further explained that residents have the choice of calling 911 if they experience shortness of breath, chest pain, or severe bleeding.  (AR 33.)  As for transportation, Mr. Cox described his reasoning for replacing the aging buses with modern contractor-provided, American with Disability Act-compliant buses.  (AR 33.)  These buses provide on campus transportation and transportation to WRAMC and the VAMC both morning and afternoon. (AR 33.)

In February 2005, Plaintiffs' counsel met with Department of Defense (DOD) representatives regarding health care services at the Home.  (Amend. Comp., ¶ 35); (AR 42.)

9

DOD provided a written follow-up to Plaintiffs' counsel following that meeting.  (AR 42-49.)

The DOD response detailed the decisions made regarding health care and the rationale for such

decisions.  Specifically, the response noted that the treatment room closure was based on a

determination that the treatment room was not cost effective, did not provide adequate service,

and was inconvenient to a large portion of the residents.  (AR 43.)  In addition, the response

indicated that the residents have annual physical examinations available to them.  (AR 45.)  In

order to protect all residents of the Home, each resident is required to undergo a skin test for

tuberculosis and to have a chest x-ray. (AR 45.)  The DOD response also addressed

pharmaceutical services stating that the pharmacy had simply been a medication room where

medications were dispensed that had been obtained by prescription from WRAMC.  (AR 47.)

Pursuant to 28 U.S.C. § 418, the Inspector General (IG) of a military department is

required to inspect the Home every three years.  28 U.S.C. § 418(a).  Responsibility for the

triennial inspection rotates among the Army, Navy, and the Air Force.  28 U.S.C. § 418(b).  The

IG inspection includes an overview of the Home's healthcare and financial management,

providing valuable feedback to the COO in the areas mandated by congress (high quality/cost

effective healthcare).  The Army IG conducted the inspection of the Home in 1999, the Navy in

2002, and the Air Force in 2005.

Army inspection results concluded that "[t]he AFRH provides excellent residential,

social, and health service to its residents who are predominately satisfied with the care they

receive."  (AR 538.)  The Army report also found that "[t]he most notable impediments

impacting the effective and efficient operation of the AFRH involve the AFRH administrative

structure and the pending insolvency of the Trust Fund."  (AR 538.)  The Army report

recommended the adoption of a permanent corporate structure to provide centralized executive authority for the AFRH.  (AR 552.)

In addressing the AFRH's compliance with health care standards, the Army report found that of the physician's assistants on staff at the Washington campus at the time of the report, at the time, only two were licensed and certified.  (AR 597.)  While the Army report did address pharmaceutical services at the AFRH, it was exclusively focused on those services as applied to assisted living and long term care patients and not to the independent living residents represented by the plaintiffs.  (AR 608-613.)

The Army report concluded that "the insolvency issue is critical and jeopardized the AFRH mission" and that "[a]ll cost saving measures should be carefully considered in light of the AFRH Trust Fund insolvency issue." (AR 617.)

In 2002, the Navy IG performed the triennial review of the Home.  In its report, the Navy IG noted several deficiencies in the operations of the Home.  In the area of healthcare, the Navy IG noted that three of the five physicians' assistants at the Home were not licensed.  (AR 684.) In the area of transportation, the Navy IG noted that convenient shuttle service is available to residents several times per day to take them to appointments at Walter Reed Army Medical Center, but the service lacks accommodations for many residents with large, motorized wheelchairs.  (AR 684.)  In addition, the vehicles used were old and unreliable. (AR 684.)  The Navy IG also reviewed the pharmacy services at the Home.  It pointed out that the pharmacy services were marginal at best, particularly because there was no unit dose dispensing system. The Navy IG noted that the pharmacy operated as a custodial medication service for dispensing maintenance medications.  Patients receive medications from WRAMC or the VAMC.  The Home's staff have access to enter a new prescription into the system.  The Home has a pharmacy

technician who fills the prescription at WRAMC (full time job) and returns them to the Home for dispensing. (AR 688-89.)  Overall, the Navy IG found that the Home's access to medical care to be superior to comparable nursing home facilities and the changes implemented at the Home have been impressive. (AR 671.)

The 2005 Air Force inspection concluded that access to medical care at the AFRH "far exceeded that at generally comparable civilian nursing home facilities."  (AR 830.)  The report found that currently AFRH-W adhered to (Joint Commission for Accreditation of Health Care Organizations (JCAHO) standards.  (AR 831.)  The report calculated that 70-80 percent of independent living residents used on campus health-care facilities as their primary care provider. (AR 831.)  The report found that

> AFRH-W offered residents adequate quality of care.  Review of credentials files revealed that providers who performed care were appropriately licensed and credentialed.  Outpatient and inpatient records reflected appropriate health maintenance activity in diabetes care, immunizations, cancer screening, functional and substance-abuse assessments and anticoagulation therapy management.  In these areas, the staff effectively administered policy and procedures.

(AR 832.)

Additionally, the 2005 report found the AFRH pharmaceutical services to be adequate. The report noted that, in regard to independent living residents, the pharmacy staff's responsibility was primarily limited to managing prescription delivery from WRAMC at a rate of approximately 1525 out-patient prescriptions per month.  (AR 834.)

The 2005 report found that the financial security of the AFRH had improved since the 2002 inspection.  (AR 776.)  The report stated "AFRH achieved success in reversing the recent trend of a declining Trust Fund balance and noted that the Fund "increased from $97.3 million (31 March 2002) to $118 million(30 September 2004)." (AR 776.)  This positive news was

accompanied by the caveat that "the Trust Fund remained significantly below the $171.2 million

balance at the end of FY92." (AR 776.) The Air Force report concluded that in fiscal year 2006,

"[d]ue to an active cost containment program, the AFRH's revenues exceeded costs on an

operating basis." (AR 776.)

## II.  ARGUMENT

### A.    The Administrative Procedure Act Provides the Necessary Waiver Of Sovereign Immunity and the Standard for Judicial Review of This Case

Although Plaintiffs do not specifically cite the Administrative Procedure Act (APA) for a

waiver of sovereign immunity, they do assert that this Court has authority to order the relief they

seek under 5 U.S.C. § 706. (Amend. Compl., ¶ 41.) Indeed, the APA is the only possible basis

for Plaintiffs to challenge Defendants' actions.[4] See 5 U.S.C. §§ 701-705. The APA waives the

government's sovereign immunity with respect to actions to review agency actions. 5 U.S.C. §

702. Such agency action must be final or otherwise made reviewable by statute. 5 U.S.C. § 704.

---

[4]  Plaintiffs asserted that this Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1361. However neither statute provides a waiver of sovereign immunity of the United States. As the D.C. Circuit has stated "Neither the general federal question statute nor the mandamus statute by itself waives sovereign immunity." Swan v. Clinton, 100 F.3d 973, 981 (D.C. Cir. 1996). It is well established that the United States cannot be sued without its consent. "[A] sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain that suit." United States v. Mitchell, 445 U.S. 535, 538 (1980) (citation omitted).

Plaintiffs' attempt to invoke jurisdiction under the Mandamus Act, 28 U.S.C. § 1361, (Amend. Compl. ¶ 2) should also be rejected because Plaintiffs have failed to set forth the necessary prerequisites for mandamus relief in their amended complaint. "The mandamus remedy is an extraordinary one, and it is to be utilized only under exceptional circumstances . . . ." Haneke v. Secretary of Health, Education and Welfare, 535 F.2d 1291 (D.C. Cir. 1976). To qualify for mandamus relief Plaintiffs must show: 1) a clear right to the relief sought; 2) the defendant has a clear duty to act; and 3) the absence of any other adequate remedy. Swan, 100 F.3d at 977; Atlantic Tele-Network Inc. v. Inter-American Development Bank, 251 F. Supp. 2d 126, 131 (D.D.C. 2003). Plaintiffs have another adequate remedy under the APA, which precludes the availability of mandamus relief. American Cetacean Soc'y v. Baldrige, 768 F.2d 426, 433 (D.C. Cir. 1985), rev'd on other grounds sub nom. Japan Whaling Ass'n v. American Cetacean Soc'y, 478 U.S. 221 (1986).

The APA does not contain an independent grant of jurisdiction; district court jurisdiction lies under 28 U.S.C. § 1331.  Since Plaintiffs are challenging the decisions made by the COO in regard to the healthcare provided residents of the Home, and assert that Defendants have acted contrary to law by violating 24 U.S.C. §413, the Court should review the case under the APA standard.

The key exhibit in an APA case is the administrative record, the written record of the agency's administrative proceedings.  In the case of a challenge to an agency's final administrative action, the court's review is limited to the administrative record.  Doyle v. England, 192 F.Supp. 2d 202, 206 (D.D.C. 2002) (citing Fund for Animals v. Babbit, 903 F. Supp. 96, 105 (D.D.C. 1995)); Environmental Defense Fund, Inc. v. Costle, 657 F.2d 275, 284 (D.C. Cir. 1981) ("It is well settled that judicial review of agency action is normally confined to the full administrative record before the agency at the time the decision was made."). "Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record."  Id. (quoting Fund for Animals, at 105); Richards v. INS, 554 F.2d 1173, 1177 n. 28 (D.C. Cir. 1977).  Judicial review of agency action should be based on "the whole record."  5 U.S.C. § 706.  The whole record includes everything that was before the agency pertaining to the merits of its decision. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 420 (1971).  Since judicial review is limited to the administrative record, discovery is not generally necessary and should be prohibited.  Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985); Commercial Drapery Contractors, Inc. v. United States, 133 F.3d 1, 7(D.C. Cir. 1998).

**B.**    <u>Administrative Procedure Act Standard of Review</u>

The APA provides that, in reviewing agency action, "the reviewing court shall . . .  hold

unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious,

an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).  The

arbitrary and capricious standard of the APA is a narrow standard of review,  <u>Citizens to</u>

<u>Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 416 (1971), and is highly deferential.

<u>Environmental Def. Fund, Inc.</u>, at 283 (citing <u>Ethyl Corp. v. EPA</u>, 541 F.2d 1, 34 (D.C. Cir.

1976).  The standard presumes the agency's action to be valid.  <u>Environmental Def. Fund, Inc.</u>, at

283 (citing <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 419 (1971); <u>Nat'l</u>

<u>Small Shipments Traffic Conference, Inc. v. Civil Aeronautics Bd.</u>, 618 F.2d 819, 826 (D.C. Cir.

1980).  The standard is a narrow one that forbids a court from substituting its own judgment for

that of the agency.  <u>Environmental Def. Fund, Inc.</u>, at 283; <u>Citizens to Preserve Overton Park,</u>

<u>Inc. v. Volpe</u>, at 416; <u>Ethyl Corp.</u>, at 34.  "The standard mandates judicial affirmance if a rational

basis for the agency's decision is presented."  <u>Environmental Def. Fund, Inc.</u>, at 283 (citing

<u>Bowman Transportation, Inc. v. Arkansas-Best Freight System</u>, 419 U.S. 281, 290 (1974); <u>Ethyl</u>

<u>Corp.</u>, at 34).  The Court's task is complete when it finds "that the agency has engaged in

reasoned decision making within the scope of its Congressional mandate."  <u>Environmental Def.</u>

<u>Fund, Inc.</u>, at 283 (quoting <u>Am. Radio Relay League, Inc. v. FCC</u>, 617 F.2d 875, 879 (D.C. Cir.

1980)).  The court must be satisfied that the agency action was "based on a consideration of the

relevant factors," <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, at 416.

The APA also calls for great deference to be afforded to the agency's interpretation of a

statute.  "[W]hen faced with a problem of statutory construction, this Court shows great

deference to the interpretation given the statute by the officers or agency charged with its

15

administration." <u>EPA v. Nat'l Crushed Stone Ass'n</u>, 449 U.S. 64, 83 (U.S. 1980) (quoting <u>Udall v. Tallman</u>, 380 U.S. 1, 16 (1965).  "We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer," <u>Chevron, U.S.A., Inc. v. NRDC, Inc.</u>, 467 U.S. 837, 844 (1984).  Because of the expertise of the Agency, the Agency's administrative decisions should be given deference. <u>American Medical International, Inc. v. Secretary of Health, Education, and Welfare</u>, 466 F.Supp. 605 (D.D.C. 1979).  This is especially so when the statute at issue is ambiguous. <u>Mineral Policy v. Norton</u>, 292 F.Supp. 2d 30 (D.D.C. 2003).

**<u>C.</u>        <u>Summary Judgment Should Be Granted in Favor of Defendants Because the Defendants' Actions Were Not Arbitrary, Capricious, an Abuse of Discretion, or Otherwise Not in Accordance With Law.</u>**

Plaintiffs make seven specific requests for relief.  Some of the requests are provided for in 24 U.S.C. § 413, while other requests for relief do not appear in the text of the Statute.  The Home's obligation under the law is to follow the Statute.  Because the Home's interpretation of the Statute is rational, Plaintiffs' requests for relief should be denied.

Plaintiffs request the ability to provide "promptly the medications" required for the treatment of residents on the same day that they are prescribed.  (Amend. Compl. at 12.)  The Statute states that the "services provided residents of the Retirement Home shall include…pharmaceutical services…"  Pharmaceutical services are provided to independent living residents by the home as described in the Resident Guide.  (AR 114.)  Residents can have prescriptions filled at no charge though WRAMC and pick them up at the medication room within 24-48 hours of receiving a new prescription.  (AR 114.)  Residents can have prescriptions refilled in approximately three days through the same process.  (AR 114.)  Alternatively,

16

residents may use the free shuttle bus (described below) to WRAMC to have their prescription filled on the same day, Monday through Saturday. The WRAMC pharmacy is open from eight o'clock in the morning until eight o'clock at night, Monday through Friday and from eight o'clock in the morning until four o'clock in the afternoon on Saturday. The pharmacy is closed on Sundays and federal holidays. (Ex. 1, Cox Supp. Decl., ¶ 4.) The Community Health Clinic is available to provide medications after normal operating hours. (AR 114.) If medication is required after hours (4:00pm to 8:00am), on the weekend, or on a holiday, residents can receive medication free of charge from the Community Health Nurse in consultation with the on-call Physician. (AR 66-67; 114.)

Plaintiffs request that the Home provide on-site x-ray services, electrocardiogram (EKG) services, laboratory work, and "other services as required to provide for primary health care of the residents." The Statute does not specifically require these services; however, the Home does provide for on-call, in-room x-ray and EKG services through a contract vendor. (AR 365, Patient guide p. 25.) The decision to discontinue the use of in-house x-ray equipment was made in part to protect patient health and safety. (AR 0048.)

Plaintiffs request that the Home establish uniform standards appropriate to the medical needs of the residents as is spelled out in 24 U.S.C § 413(c)(3). The Home has done so by publishing the Resident Guide, Standard Operating Procedures for Health Care Services and Nursing Policies and Procedures, and the AFRH Chief Operating Officer Fact Sheets. The Home is required to remain accredited by 24 U.S.C. § 413a(c)(2). The supplemental accreditation of the independent living portion of the Home is scheduled to begin this fall. (Ex.

1, Cox Supp. Decl., ¶ 5.)  This accreditation by a second agency is in addition to JCAHCO

accreditation for Assisted Living and Long Term Care services. (AR 673.)

     Plaintiffs request that the Home provide qualified physicians available to provide primary

health care to residents during business hours and available to see residents as needed at other

times.  (Amend. Compl., at 11.)  The Statute requires the Home to "have a physician and a

dentist—(A) available at the facility during the daily business hours of the facility; and (B)

available on an on-call basis at other times."  24 U.S.C. § 413(c)(1).  Additionally, the Statute

requires the physicians to have skills and experience suited to the residents of the Home.  24

U.S.C. § 413(c)(2).

      The Community Health Clinic is staffed by a physician and is open from 7:30am until

noon for walk-in residents and from 1:00pm to 4:00pm to see scheduled appointments.  (AR 66-

67.)  Additionally, the Clinic is staffed by the Community Health Nurse, with a Physician

available on-call, from 4:00pm to 8:00am when the Clinic is closed.  (AR 114.)  The Home is

prohibited from providing an acute care facility and emergency care is referred to local

authorized facilities.  24 U.S.C. § 413(b); (AR 66-67; 112.)

     Plaintiffs request that the Home provide qualified dentists available to provide dental care

to residents during the business hours of the Home and available to see residents at times other

than daily business hours.  The Statute places the same requirement on the Home for on-call

dental services as it does physician services.  24 U.S.C. § 413(b).  Like the Community Health

Clinic, the Dental Clinic is available from 7:30 a.m. until noon for walk-in residents and from

1:00 p.m. to 4:00 p.m. to see scheduled appointments.  (AR 66-67; 113.)

The Dental Clinic provides: comprehensive oral exams, cleaning, limited emergency care, fillings, root canals, crowns, initial periodontal therapy, and simple extractions. (AR 113.) The emergency care provided by the dentist during normal business hours is limited to pain management and reducing swelling.  As the COO states in his supplemental declaration, such dental emergency care after hours can be provided by the physician on call or the nurse on duty. (Ex. 1, Cox Supp. Decl., ¶ 3.)  Residents can then see the dentist the following morning on a walk-in basis.  Because the duties of an on call dentist would be identical with the duties of an on call physician and the nurse on duty, the Home only has one physician on call who provides urgent but nonacute dental and medical coverage for residents after hours.  Of course, in a true dental emergency, just as with a medical emergency, the appropriate action would be to call 911.

Plaintiffs request the Home provide scheduled transportation to other medical facilities every day, including weekend and holidays, at no charge.  The Statute requires the Home to provide "daily scheduled transportation to nearby medical facilities used by residents of the facility."  24 U.S.C. § 413(d)(1).  Additionally the Statute provides that the Home "may provide, based on a determination of medical need, unscheduled transportation for a resident of the facility to any medical facility located more than 30 miles from the facility for the provision of necessary and urgent medical care for the resident."  24 U.S.C. § 413(d)(1).  Free daily transportation is scheduled hourly, Monday through Friday to WRAMC, VAMC, and Washington Hospital Center.  (Ex. 1, Cox Supp. Decl., ¶ 4); (AR 832.)  This weekday shuttle is scheduled in order to provide access to off campus medical facilities during their hours of operation.  (Ex. 1, Cox Supp. Decl., ¶ 4.)   While weekend and holiday transportation is not scheduled, it is available on an on call basis through a contracted van service provided at no cost

19

to the residents.  (Ex. 1, Cox Supp. Decl., ¶ 4.)  This same service (on call) is available on weekdays after hours.  (AR 117-118.)

Finally, Plaintiffs request that residents receive annual physical examinations.  The Statute is silent on the need for annual examinations but the Home requires residents to have an annual tuberculosis screening and chest x-ray.  (AR 45)  Residents can schedule an examination at any time at the Community Clinic.  (AR 45).  As stated in previous correspondence with the Plaintiffs, "[r]esidents have freedom of choice to obtain an annual physical at the Home."  (AR 45.)

The Administrative Record is clear.  There is no dispute that the Home provides prompt medications, on-site x-ray, EKG, and related services, and annual physical examinations.  The COO has established uniform standards for access to health care for the Home's residents.  The Administrative Record is evidence of this, particularly the Resident Guide, the numerous AFRH Chief Operating Officer Fact Sheets, and the Standard Operating Procedures for Health Care Services and Nursing Policies and Procedures.

As for the other items of requested relief, the Home is in compliance with the Statute, despite Plaintiffs' differing interpretations.  The Home satisfies the Statute by having a physician at the Home during the daily business hours and available on call after hours and on weekends and holidays.  The Home also satisfies Congress' intent on dental care. While the Home is only authorized to provide "nonacute medical and dental care," Congress intended that the Home provide a treatment plan for urgent but nonacute dental needs of its residents after hours.  The Home does this through the physician on call.  As with true medical emergencies, a resident with a true dental emergency would need to call 911.  As for daily scheduled transportation, the Home

provides transportation to WRAMC, the VAMC and Washington Hospital Center on an hourly basis during the week and on an on call basis on weekends. This is consistent with the operating hours of the clinics at those off campus medical facilities.

The Statute mandates "[t]he Retirement Home shall provide for the overall health care needs of residents in a high quality and cost-effective manner . . . 24 U.S.C. § 413(b). Plaintiffs do not allege that the Home has failed to provide these services but take issue with the quality of the services provided. In applying the APA standard, the Court must consider whether the decision was based on a consideration of the relevant factors and cannot substitute its judgment for that of the agency. Environmental Def. Fund, Inc., at 283 ("The standard mandates judicial affirmance if a rational basis for the agency's decision is presented.") The Court's task is complete when it finds "that the agency has engaged in reasoned decision making within the scope of its Congressional mandate." Environmental Def. Fund, Inc., at 283 (quoting Am. Radio Relay League, Inc. v. FCC, 617 F.2d 875, 879 (D.C. Cir. 1980)).

The decisions regarding the health care services provided at the Home, largely made by the COO, have been the product of reasoned decision making and have been based on the relevant factors as provided in the Administrative Record. Since there is a rational basis for the decision of the Agency, the Court should affirm those decisions. The decisions are afforded deference and are presumed valid, especially an agency such as the Home, due to its expertise in matters regarding continuing care communities. In addition, the COO has turned around the Home's financial fortunes, saving it from certain insolvency by increasing the amount of money in the Home's Trust Fund from $97.3 million (31 March 2002) to $118 million (30 September 2004). (AR 776.) Plaintiffs may disagree with a particular choice made; however, the choice of

one particular action over another is not arbitrary, capricious or an abuse of discretion "'simply because one may happen to think it ill-considered, or to represent the less appealing alternative solution available.'" <u>Fund for Animals v. Babbitt</u>, 903 F. Supp. 96 (D.D.C. 1995), citing <u>Hondros v. United States Civil Service Comm'n</u>, 720 F.2d 278, 295 (3d Cir. 1983) (quoting <u>Calcutta E. Coast of India & E. Pakistan v. Federal Maritime Comm'n</u>, 399 F.2d 994, 997 (D.C. Cir. 1968)). The decisions regarding health care at the Home are rational, based on relevant factors, and are not clear errors of judgment. Therefore, the Court may not substitute its judgment for that of the agency. <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 416 (1971).

In sum, the changes implemented at the Home regarding resident health care improved the efficiency of health care delivery to residents. The Home continues to provide residents with high quality care in a cost-effective manner. In so doing, the Home has been able to make changes in the operations of the Home which enabled it to turn around a steady financial decline and become self-sustaining. The changes implemented by the COO have strengthened the quality of healthcare, while reversing the downward financial spiral in which the Home found itself. Without the changes, the survival of the Home was in danger. As a result of the changes, the Home continues to provide high quality care in a cost-effective manner, and will continue to do so for many years to come. Given those facts, in cannot be said that the Defendants' healthcare decisions have been arbitrary, capricious, or contrary to law or regulation.

### III. CONCLUSION.

For the foregoing reasons, Defendants respectfully request that this Court grant Defendants' Motion for Summary Judgment.

Respectfully submitted,

/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

/s/_____
BRIAN C. BALDRATE
Special Assistant United States Attorney
Civil Division
555 4th St., N.W.
Washington, D.C.  20530
(202) 353-9895

Of Counsel:
Major Patrick Gary
U.S. Army Legal Services Agency
Arlington, Virginia  22203-1837

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MARTIN CODY et al.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 05-1041 (RJL)** |
| | ) | |
| **ROBERT M. GATES** | ) | |
| **Secretary of Defense et. al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS' STATEMENT OF MATERIAL FACTS
## <u>WHICH ARE NOT IN GENUINE DISPUTE</u>

Pursuant to LCvR 7(h) and in support of Defendants' Motion for Summary Judgment, Defendant respectfully submits this statement of material facts as to which there are no genuine disputes.

1.    The Home is funded by Congressional authorization for funds to be expended from a Trust Fund held by the United States for operation of the Home.  (Amend. Compl. ¶ 15.)

2.    The Trust Fund receives its revenues from money collected from monthly active duty payroll deductions from enlisted soldiers (currently fifty cents per month), resident fees, fines and forfeitures from the Armed Forces, gifts, bequeaths, and interest earned on the balance of the Home's Trust Fund.  (AR 153); (Amend. Compl. ¶ 15.)

3.    Each year Congress provides the Home with a lump sum appropriation from the Trust Fund.  (AR 153.)

4.    The balance of the Trust Fund had declined from $171.2 million in 1995 (AR 776) to $94 million in 2002.  (AR 170.)

5.      The residents of the Home fall into one of three categories for the purposes of managing their health care: Independent Living, Long Term Care, or Assisted Living.  (AR 679-81.)

6.      The Home has four physicians available to see patients, the same number of physicians that have always been available to see patients.  (AR 44.)

7.      All residents are assigned to one of these providers when entering the Home. (AR 44.)

8.      Annual physical examinations are available to residents of Independent Living. (AR 45.)

9.      Twenty-four hour physician coverage is provided at the Home.  (AR 43-44); (AR 66-67.)

10.      A physician is on-call between the hours of 4:00 p.m. until 7:30 a.m. seven days a week.  (AR 43.)

11.       The Community Health Clinic is conveniently located on the ground floor of the Scott Building, an Independent Living dormitory housing most residents. (AR 112, 118.)

12.      Residents in Independent Living receive dental check-ups when requested by appointment (dental care is provided on a routine basis for Assisted and Long Term Care residents).  (AR 113.)

13.      Emergency dental care is provided on a walk-in basis every morning. (AR 113.) Emergency dental care provided at the Home consists only of pain and intraoral swelling management.  (AR 113); (Ex. 1, Cox Supp. Decl., ¶ 3.)

2

14.    The following dental services are also provided at the Home:  comprehensive oral examinations, urgent care such as pain management, basic tooth cleaning, fillings, root canal, single crowns, and simple extractions. (AR 113.)

15.    A mobile dental clinic comes on campus five days per week to provide dental services for Assisted Living and Long Term Care residents.  (AR 113.)

16.    More extensive dental needs are handled by referrals.  (AR 34.)

17.    If there is a non-emergent dental incident after hours, such as pain or swelling, the nurse on duty and the on call physician provide appropriate treatment in responding to the resident, whether the pain is medical or dental in nature.  (Ex, 1, Cox Supp. Decl., ¶ 3.)

18.    The Home's residents have after hours non-emergency transportation available to them from 8:00 pm until 8:00 am.  (AR 117.)

19.    After hours non-emergency transportation is available from Monday through Friday, weekends and holidays.  (AR 117.)

20.     The residents may obtain non-emergency transportation after hours by requesting it through the Home's Security Office.  (AR 117-18.)

21.    After hours non-emergency transportation covers transportation to WRAMC, VAMC, and the Washington Hospital Center at  no cost to the resident. (AR 117-18.)

22.    Off campus transportation is provided hourly, Monday through Friday, 6:50 a.m. to 6:00 p.m.   (AR 117.)

23.    The Home provides Independent Living residents with medications via a medication room, which allows residents to pick-up the prescriptions filled at WRAMC.  (AR 114.)

3

24.     Independent Living residents can receive medications within 24-48 hours; however, refills take three days.  (AR 114.)

25.     Normally, when a resident is ill and requires prescription medication, the physician will provide the proper dosage.  (AR 114.)

26.     The resident's prescription will be electronically sent to WRAMC to be filled. 9AR 114.)

27.     The Home has a full-time pharmacy technician who fills the prescription at WRAMC and returns them to the Home for dispensing.  (AR 688-89.)

28.      Residents of the Home have medications available to them after hours in the Community Health Clinic.  (AR 114.)

29.     Medications are available during the hours of 4:00 pm and 8:00 am when the Clinic is closed at no cost to the residents. (AR 114.)

30.     X-ray and EKG services are provided at the Home through a contract with a private vendor.  (AR 114.)

31.     EKG services are available in the Community Health Clinic when needed and are provided by private vendor.  (AR 114.)

Respectfully submitted,

 /s/
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

 /s/
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

4

     /s/
     BRIAN C. BALDRATE
     Special Assistant United States Attorney
     Civil Division
     555 4th St., N.W.
     Washington, D.C.  20530
     (202) 353-9895

Of Counsel:
Major Patrick Gary
U.S. Army Legal Services Agency
Arlington, Virginia  22203-1837

5